**DELORO SMELTING AND REFINING COMPANY, Limited**

v.

**The UNITED STATES.**

No. 92–59.

United States Court of Claims.

May 10, 1963.

David Cobb, Washington, D. C., for plaintiff.

Edward L. Metzler, Washington, D. C., with whom was Asst. Atty. Gen., John W. Douglas, for defendant.

Before JONES, Chief Judge, and WHITAKER, LARAMORE, DURFEE and DAVIS, Judges.

DAVIS, Judge.

This is a dispute over the price term of an unusual supply contract. In 1950, as part of the federal stockpile program, the United States desired to acquire and store cobalt metal. Plaintiff is a Canadian smelting company which has been, off and on for many years, a producer of this metal from the ore or concentrate. A French Moroccan corporation (Societe Miniere de Bou-Azzer & du Graara—called SMAG for short) had substantial deposits of cobalt ores in French Morocco. After considerable negotiation between the French and United States Governments, SMAG and plaintiff (Deloro), agreement was reached upon a project—later formalized in a contract signed in October 1950 by the plaintiff, defendant, and SMAG—under which SMAG ores and concentrates in Morocco were to be shipped to Deloro's smelter in Ontario and refined there, with the resulting metal to be delivered to the defendant for stockpiling in the United States. SMAG was to forward the raw materials according to a specified schedule, with final delivery to Deloro to be on or before November 1, 1952. Plaintiff, in turn, was to make scheduled deliveries to the defendant, with the full quantity of metal to be delivered not later than June 30, 1953.

The price the Government was to pay for the cobalt metal was composed of two elements: (a) a payment to SMAG of French francs in an amount equivalent to one-half of the dollar price of the cobalt *concentrates;* and (b) a payment to plaintiff of a dollar sum for each pound of cobalt *metal.*[1] An escalation clause provided that, after a certain date, the latter payment was to be a fixed percentage of the domestic United States market price quotation for cobalt, published in the *Engineering and Mining Journal* "as of the date of delivery of

the cobalt metal" to the defendant. There was also to be an adjustment in the price by the use of the foreign exchange rate of Canadian for United States dollars current "at the date of delivery." Over the life of the agreement, the cobalt market quotation increased in four steps, from $1.80, to $2.10, to $2.40, to $2.60; the Canadian dollar increased from below parity to above parity.

SMAG made timely delivery of the cobalt concentrates, but plaintiff, for various reasons attributable to its own difficulties and its managerial election to favor its own economic interests at the expense of this contract with the Government (without, however, any bad faith or speculative purpose), failed to comply with its delivery schedule set forth in the contract, even as extended by the provisions for taking account of excusable delay. Defendant knew, of course, of these failures, but it did not terminate further performance of the contract (as it had a right to do) because it felt that Deloro was the only producer able to supply the necessary stockpile metal without interfering with current supplies to American industry, and without an excessively costly program of reshipment of the concentrates back to the Eastern Hemisphere.[2] In addition, the defendant felt that it had a commitment to the French Government to have the cobalt metal enter the United States stockpile by June 30, 1953 (the final contract delivery date), or as soon thereafter as possible.

For the shipments prior to February 1954, defendant's accounting and financial personnel paid plaintiff at prices computed by using the cobalt market price quotation and the exchange rate on the date delivery was actually made, not the date on which delivery was due. In February 1954 defendant began to

1. Plaintiff was to pay a portion of this amount (in effect) to SMAG, so that the latter's payment would consist of a combination of the direct payment by the defendant in French francs and of a payment by plaintiff in dollars.

2. The Belgian Katanga concern, the other major producer of cobalt, was then furnishing the metal to American industry. Its plant was in Belgium.

insist that the computations had to be made as of the date of the scheduled delivery, rather than the delayed dates of actual delivery. Since prices so calculated were, in the main, higher on the dates of actual delivery, defendant deducted sums from current invoices to make up for the asserted over-payments in the past. In April 1954 Deloro (which had contested the defendant's theory) refused to make any further deliveries because of these disallowances, and informed defendant that it would not resume performance until payment of the $100,628.32 it believed owing for past deliveries, as well as a binding agreement by defendant to pay for future shipments on the basis of the actual delivery date.

When plaintiff thus ceased performance under this contract, it had delivered 1,303,925 pounds of cobalt metal, and 194,088 pounds were left to be delivered. Some 2,151,660 pounds of SMAG cobalt concentrates were in plaintiff's hands awaiting treatment. Further negotiations ensued, but there was no settlement of the dispute. In March 1956 the Comptroller General, following his own earlier decisions, ruled that Deloro had no·right to increase the cost of Government supplies by its own failure or refusal to deliver by the promised time. Both parties stood their ground. Late in 1956, Deloro took over the remaining cobalt for its own account. The Government brought suit in a Canadian court and plaintiff has sued here.

The commanding issue for us, as it has been for the parties since 1954, is the meaning to be assigned to the phrase "as of [or "at"] the date of delivery of the cobalt metal" in the price escalation and exchange-rate adjustment clauses of the contract. Is this the date of actual delivery, even though delivery was delayed by the plaintiff without justifiable excuse under the contract? Or is it the date on which delivery was due under the contract delivery schedule? Around this question the whole dispute revolves.[3]

This is another case (see W. H. Edwards Engineering Corp. v. United States, Ct.Cl., No. 218–59, decided April 5, 1963) in which the evidence of the parties' subjective intention is of little assistance. The critical issue was not broached until 1954 and there is no adequate showing of what the parties consciously thought about the point, if it was in mind at all, prior to that time. In this connection, we attribute little significance to the course of payments by defendant (in 1951, 1952, and 1953) using the date of actual delivery for the cobalt market price quotation or for the dollar rate of exchange.[4] These payments were made, more or less routinely, by fiscal and accounting employees who had no procedures for determining whether the shipments were late and did not concern themselves with that problem. The defendant's contracting officers were wholly unaware of the basis of the payments, of plaintiff's filing of amended invoices (see footnote 4), or of the existence of any issue between the parties as to the proper method of calculation. If the Government officials whose actions are cited as revealing the defendant's own construction of a contract are not significantly tied to the administration of contract performance, their conduct is meaningless as an aid to contract interpretation. When the canon of construction speaks of giving weight to the "parties'" own interpretation, it refers, so far as the Government is concerned, to a responsible officer assigned the function of overseeing the essentials of con-

3. The case cannot be disposed of on the ground that the defendant waived any breach by continuing to accept the late deliveries. There is nothing in this contract overriding the normal rule that a vendee does not, merely by accepting late delivery, waive a claim properly arising out of the lateness. Williston, Contracts, 3d ed., Secs. 704, 700, 702. Acceptance of the late shipments did not alter the price term of the contract.

4. Some of these payments were made after plaintiff submitted amended invoices recomputing prices on the basis of the dates of actual delivery rather than the due dates (which the original invoices had used). See footnote 5.

tract performance—not to any federal employee or officer whose work happens to be connected with the contract. Agency fiscal or finance offices are not ordinarily a significant part of the process of negotiating and performing contracts. Cf. United States v. Joseph A. Holpuch Co., 328 U.S. 234, 240–241, 66 S.Ct. 1000, 90 L.Ed. 1192 (1946). The auditors' payments on which plaintiff relies do not, therefore, advance its cause.[5]

Nor are we helped in this case by the institutional history which often clarifies the meaning of a standard Government contract or clause. In its pertinent articles, this was not a standard-form agreement but an ad hoc arrangement negotiated by the parties for a special situation. The record contains no enlightening information on comparable escalation or adjustment provisions. We cannot charge the defendant with any ambiguities since plaintiff appears to have initially proposed the terms which are now disputed; but there was also considerable negotiation and the plaintiff does not seem to be so much the author that it should bear, on that account, the brunt of uncertainties.

■ The only guide left to us is the traditional principle that the contract words must be interpreted as they would probably be understood by reasonable men standing in the parties' shoes. The plaintiff says that reasonable men, reading the words "as of the date of delivery", would naturally take the contract to mean that the price would vary with the date of actual delivery; if the defendant did not wish to pay that price for a delayed shipment, it could termi-

nate the agreement (under the clause authorizing cancellation for breaches) and sue for damages, if any; but the defendant could not accept delayed deliveries (as defendant did) and insist on paying at the rate which would have been applicable if the shipments had been made on time.

■ This may be one parsing of the contract, but to us it does not seem a sensible reading of the words "date of delivery" in this particular agreement. At the time the arrangement was made, all the signs looked toward payment at the price current on the date of due delivery and pointed away from the possibility of late deliveries. Prompt delivery was undoubtedly important to the defendant. The statutory authority to receive cobalt was due to expire on June 30, 1953, and the procurement officials believed that quick delivery was essential. The contract reflected this urgency by incorporating a schedule of shipments and providing expressly that "the full quantity of cobalt metal required to be delivered by Deloro to E.P.S. [the defendant] under this contract shall be delivered not later than June 30, 1953." The parties thought, as our findings show, that Deloro would surely be able to meet this schedule; there was no expectation of failure. At the same time, the parties affirmatively anticipated that the price of cobalt would rise in response to the Korean hostilities. The role of the escalation and adjustment clauses was to take account of such increases which might occur prior to a particular delivery date fixed in the contract. These price-change provisions were plainly

5. There is, moreover, a weighty counterbalance to the finance office's ultimate payments to plaintiff on the basis of the delivery dates. When plaintiff realized that it would not meet the first delivery date in the contract schedule (March 10, 1951) and sought an extension to April 10, 1951, it specifically proposed that the shipment "shall be priced in the same manner as if delivery had been made prior to April 1st, 1951" (since the escalation clause contemplated an increase in price after April 1). The Government agreed to the extension on this basis.

The appropriate inference would seem to be that, at that time, the parties believed that the price provisions of the contract were tied to the scheduled delivery dates. In addition, it is noteworthy that for shipments from November 1951 through February 1952, Deloro itself billed defendant at the $2.10 price current before October 1, 1951—when most of this metal had been scheduled for delivery—even though the price rose to $2.40 on October 1st. It was only later that amended invoices were filed (see footnote 4).

meant to be intertwined with the due dates for delivery—expected by both sides to become the actual dates of delivery. It is wholly reasonable to link the neutral phrase "as of the date of delivery", in the escalation and adjustment clauses, directly to the contract schedule. The "plain words" can easily carry that construction without creaking.

The obvious vice of plaintiff's interpretation, on the other hand, is that it would permit the contractor to reap a financial benefit from its own unexcused delay. The defendant would have to pay more *because* (and not simply in spite) of plaintiff's breach, and the plaintiff would gain because of its default. Since prices were expected to rise, this would have been the only likely result of a clause requiring escalation and currency adjustments to be figured as of a delayed delivery. There was little probability of the defendant's receiving a reduced price through delay. Accordingly, there would be a malevolent incentive, if plaintiff were right, for the contractor deliberately to postpone performance in order to increase its recovery. This contractor acted in good faith, we have found, but the defendant can hardly be thought to have thrust its head into the lion's mouth in the hope that the animal would turn out to be a vegetarian. Cf. Padbloc Company, Inc. v. United States, Ct.Cl. No. 523–57, decided April 5, 1963, slip op. p. 7. Nor would the power to cancel the contract for lateness, or the dubious privilege of being able to sue for damages, compensate for such indulgence to the contractor. Cancellation would leave the stockpile unsatisfied and frustrate the goal of procuring the required tons of cobalt as soon as possible. A potential claim for damages is likewise an unsatisfactory substitute; it is tantamount to pinning all one's hopes on the two birds still in the bush.

■ Standing where the negotiators stood in 1950 and studying the language they used, the objective observer would have to conclude, we think, that this contract did not provide for escalation for deliveries which were unexcusedly late. The defendant would not have accepted such a requirement and the plaintiff would not have asked it to agree. "Business contracts must be construed with business sense, as they naturally would be understood by intelligent men of affairs." The Kronprinzessin Cecilie, 244 U.S. 12, 24, 37 S.Ct. 490, 492, 61 L.Ed. 960 (1917) ; see also Phillips Petroleum Co. v. Gable, 128 F.2d 943, 944–945 (C. A. 10, 1942).

Plaintiff envisages hypothetical difficulties if "date of delivery" is given the meaning "date of due delivery", rather than "date of actual delivery." What if, plaintiff says, the contractor anticipated the due date; would the due date still govern? We see no great problem, under this contract, in consistently applying the due date—whether the shipment be on time, early, or delayed—and no unfairness to either party. That is the price the defendant expected and agreed to pay, and which plaintiff expected and agreed to receive. It imposes no penalty on plaintiff which would obtain the agreed price whether or not the market (or the exchange rate) rose or fell after the due date.

■ But since we hold that the contract fixed the price as of the due date, we cannot accept defendant's latest position that it would be entitled to a lower price if that prevailed at the time of late delivery. The parties' agreement did not so stipulate, and there is no reason to imply an exception in this case any more than in the ordinary instance in which a price is fixed (without escalation) for an item scheduled to be furnished at a certain time but where at the moment of late delivery the market price happens to have fallen or the contractor's costs of performance decreased; the defendant might prove and recover damages for the delay but the price term of the contract would not be altered. Nor can we agree that the adjustment clause relating to dollar exchange requires that calculation to be made as of the date of actual delivery. Both clauses —the price escalation and the curren-

cy adjustment provisions—contain the same phrase ("date of delivery") and they must be read alike. It would be somewhat advantageous to defendant, because of the currency fluctuations, to construe the adjustment clause as referring to actual delivery, but that happenstance cannot modify the contract.

Using the due date as the proper measure, the parties are agreed that plaintiff has already been paid more than enough. It cannot recover and its petition must be dismissed.

Defendant ·has interposed a counterclaim demanding judgment against plaintiff for two elements of damage: (a) the overpayments made by defendant for the cobalt metal delivered by plaintiff, and (b) the value of the one-half interest of the United States in the remaining cobalt concentrates (purchased jointly by plaintiff and defendant from SMAG) which plaintiff converted to its own use and did not refine into metal for delivery under this contract. The parties have stipulated that, if the defendant's interpretation of the contract as to the proper date for price computation is correct, plaintiff has been overpaid $20,829.34. Defendant is entitled to recover this sum as part of its counterclaim.

When plaintiff improperly refused (in April 1954) to make any more deliveries under the contract, it had on hand sufficient cobalt concentrates received from SMAG to process 194,088 pounds of cobalt metal. For this concentrate the United States had paid SMAG, in franc counterpart funds, the equivalent of $129,356.51, as the Government's share of the price of the materials. In using these concentrates for its own purposes, plaintiff consumed materials belonging to the defendant to this extent. By rejecting plaintiff's theory of the current price, we also necessarily hold that plaintiff had inadequate legal justification for refusing to make further deliveries of cobalt metal to defendant and for diverting these cobalt concentrates to its own private uses. Plaintiff does not deny that, in these

circumstances, the United States is entitled to judgment for the $129,356.51 it paid for the concentrates. This portion of the counterclaim is also recoverable.

Plaintiff is not entitled to recover and its petition is dismissed. Judgment is entered for the defendant, on its counterclaim, in the sum of $150,185.85.