**TULELAKE IRRIGATION DISTRICT**

v.

**The UNITED STATES.**

No. 445–60.

United States Court of Claims.
March 12, 1965.

Alvin Landis, Sacramento, Cal., for plaintiff.

Herbert Pittle, Washington, D. C., with whom was Asst. Atty. Gen. Ramsey Clark, for defendant.

Before COWEN, Chief Judge, and LARAMORE, DAVIS and COLLINS, Judges.

DAVIS, Judge.[1]

The major question is the interpretation of an ambiguous contract provision allocating costs for the removal of excess water from the Lower Klamath Lake Wildlife Refuge (or Area). The clause first appeared in an agreement entered into, in 1946, between the Bureau of Reclamation and the Fish and Wildlife Service of the Department of the Interior; it was incorporated by reference in a contract dated September 10, 1956, between the United States and the plaintiff. In this action, plaintiff seeks to recover alleged overpayments it made to the defendant, under this 1956 contract, for the years 1957, 1958, and 1959.

In 1905 the Secretary of the Interior authorized the Klamath Project in the region where California meets Oregon. The general plan was to reclaim certain lands by unwatering Little Klamath Lake, Goose Lake, and Tulelake. Statutory authority for the project, as well as for the disposition of the reclaimed lands under the federal reclamation laws, was given by the Congress of the United States and the Legislatures of Oregon and California.

During the course of the development and growth of the project, the Lower Klamath Lake Wildlife Refuge and the Tulelake Wildlife Refuge were established by Executive Orders. Within the Tulelake Wildlife Refuge is a sump of about 13,000 acres, which has a large capacity to store water. This water has its origin in precipitation, surface run-off, uncontrolled flows from the Lost River, and return flows from irrigated lands surrounding the sump. When not disposed of by re-use for irrigation or by evaporation, water from the sump is removed through Pumping Plant D, into the Tulelake Tunnel. From the tunnel, it flows into the P Canal, where part is used to irrigate 5,000 acres of adjacent land. The remaining waters are discharged from the P Canal into the Lower Klamath Lake Area (or Wildlife Refuge).

The Lower Klamath Lake Wildlife Refuge or Lower Klamath Lake Area (sometimes called the "Service Area" because it is under the jurisdiction of the Fish and Wildlife Service) consists of about 29,000 acres of land and water divided into a series of ponds and irrigated areas. It derives its water from (a) the Tulelake Sump via Pumping Plant D, the Tulelake Tunnel, and the P Canal; (b) precipitation, stream flow, and drainage; (c) imports from the Ady

---

1. The court is indebted to Trial Commissioner C. Murray Bernhardt, from whose opinion we borrow substantially although we arrive at some conclusions different from his.

Canal, which carries water from the Klamath River to the Lower Klamath Lake Area.

Prior to 1942 the Bureau of Reclamation had jurisdiction over the entire Klamath Project, with the Fish and Wildlife Service operating the refuges. In January 1942, long before the plaintiff Irrigation District came into being, the Bureau and the Service entered into an agreement which transferred jurisdiction of the Tulelake Sump and the Lower Klamath Lake Area (the Service Area) to the Fish and Wildlife Service and provided for the construction of certain water control facilities. The contract recognized the need to remove excess water from the Lower Klamath Lake Area, but provided only that the costs of such removal would be apportioned by agreement between the agencies or by the Secretary of the Interior if they failed to reach an accord.

On June 28, 1946, prior to the plaintiff's organization, this agreement was modified. The provisions of the amendatory agreement covering the removal of excess water from the Lower Klamath Lake Area were as follows:

"7. The Bureau will pay all construction costs for the pumping facilities now being erected for the removal of excess water from the Lower Klamath Lake Area.

"8. The aforesaid pumping facilities will be operated by the Bureau. The Bureau may continue to pump, as provided in Article 16 of the existing agreement, excess water from the Tule Lake Restricted Sump into the Service's Lower Klamath area, through Tule Lake tunnel.

"9. The Bureau will remove from the Service's Lower Klamath area all water brought through Tule Lake tunnel which is in excess of the normal capacity of the Service Area and which it is necessary to remove in order to permit the efficient carrying on of the Service's functions.

"10. The Service will reimburse the Bureau for the cost of removing from the Service Area the *first* 50,-000 acre-feet of such water brought through Tule Lake tunnel annually and which is determined to be in exity, and the Bureau will bear the excess of the aforesaid normal capacpense of removing excess water brought through the tunnel in excess of said 50,000 acre-feet annually." [Emphasis in original.]

The channel through which excess water was removed from the Service Area was the Klamath Straits Drain; from there it was pumped through Plants E and F, after which the excess water was eventually discharged into the Klamath River. Over the years, the Bureau billed the Fish and Wildlife Service for reimbursement under this 1946 agreement.

On September 10, 1956, the plaintiff and the United States (acting through the Bureau of Reclamation) contracted for the furnishing to the plaintiff of a water supply from the Klamath Project; for the repayment of certain construction charges by plaintiff; and for the transfer to the plaintiff of the operation and maintenance of specified works and properties useful for the delivery of water to and the protection of lands within the Irrigation District. The plaintiff was also required to reimburse the United States for the operation and maintenance costs of certain "reserved works" (facilities not transferred to plaintiff) in accordance with fixed percentages stipulated in the contract. With respect to the particular facilities involved in this case, the contract provided that the plaintiff pay:

"100 per cent of the cost of operation and maintenance of the P Canal, the Klamath Straits Drain, and Pumping Plants E and F less:

\* \* \* \* \*

"(2) The share of costs assignable to the Fish and Wildlife Service pursuant to Article 10 of the Amendatory Agreement of June 28, 1946, between the Bureau of Reclamation and the Fish and Wildlife Service [see supra]."

During the negotiations which led to this contract of September 10, 1956, the plaintiff was not apprized of the method of computation used by the Bureau of Reclamation in obtaining reimbursement from the Fish and Wildlife Service for the cost of eliminating excess water from Lower Klamath Lake Area. The plaintiff was simply told that the Fish and Wildlife Service paid for the removal of the first 50,000 acre-feet of excess water brought into the Service Area through the Tulelake Tunnel. Plaintiff learned the Bureau's specific method of reimbursement when it received the Bureau's statement of the actual costs of operation and maintenance and the credit against those costs assignable to the Fish and Wildlife Service. Immediately, the plaintiff protested the Bureau's computation as a violation of the contract, suggested an alternative allocation formula, and sought to recover the difference by way of offset. The Bureau refused to permit this, threatening to withhold water and, if necessary, to take over the facilities. As a result, the plaintiff was forced to pay the allegedly excessive charges under protest. This suit followed.

The theory of the 1956 contract is that plaintiff should bear *all* of the cost of removing water from the Lower Klamath Lake Area *less* the amount which the Fish and Wildlife Service was required to pay under its 1946 agreement with the Bureau of Reclamation. The plaintiff contends that, under the method of computation employed by the two agencies, the Service was not asked to pay the Bureau as much of the cost as the 1946 agreement contemplated. The plaintiff's interest is, of course, to increase the Service's share of the expense, since that portion applies as a credit against the plaintiff's own obligation.

The parties' clash over the meaning of the 1956 contract arises out of the physical fact that the Service Area (the Lower Klamath Lake Area) receives water, not only from the Tulelake Sump through Pumping Plant D and the Tulelake Tunnel, but also from the Ady Canal [2] and from independent precipitation, stream flow, and drainage. When water is drained off as excess from the Service Area, this excess is the commingled result of water coming from these three separate sources. In addition, some of the water pumped from the Sump through the Tunnel, which then goes into the P Canal, never reaches the Service Area (and therefore is never removed as excess) but is used to irrigate the so-called P Canal lands. The Bureau's method of allocation disregards these variations and proceeds on the assumption that the first 50,000 acre-feet of water from the Tulelake Sump (the cost of removing which, to the extent it becomes excess, is chargeable to the Fish and Wildlife Service) is ordinarily the last to be removed as excess from the Service Area. The first step in the Bureau's allocation is to measure the annual amount of water pumped from Tulelake Sump through Plant D and the Tulelake Tunnel, and then to subtract 50,000 acre-feet at once. The difference (to the extent it is removed from the Lower Klamath Lake Area) is considered the amount of water which is chargeable to the plaintiff as excess. The Fish and Wildlife Service is billed only for the cost of exporting the remaining amount of water, if any. The result is that if, after having been reduced by 50,000 acre-feet, the amount of water leaving Plant D is equal to or greater than that ultimately exported from the Service Area, the entire cost of removing the excess water is borne by plaintiff. See finding 33.

In charging plaintiff with all the water above 50,000 acre-feet which leaves Plant D and in disregarding both the destination of that water and the other sources feeding the Service Area, the Bureau's method ignores the amount pumped through Plant D which serves the P

---

**2.** The Fish and Wildlife Service, not the Bureau of Reclamation, brings water into the Service Area through the Ady Canal.

Canal lands and never reaches the Lower Klamath Lake Area; it only indirectly takes into account the water brought into the Lower Klamath Lake Area by the Fish and Wildlife Service through the Ady Canal[3]; and it can be argued to by-pass the requirement of a prior determination of the amount of water which is considered by the Fish and Wildlife Service to be in excess of the Service Area's normal capacity. For these reasons, plaintiff contends that this method of allocation is improper under the contract.

■ The defendant does not agree that its allocation contravenes the terms or intent of the 1956 agreement, but its primary answer is that, whatever a fresh reading of the contract might now reveal, the plaintiff Irrigation District must be held to have agreed to the Bureau's established method of apportionment. It is said, first, that actual knowledge of the manner in which the cost of removing excess water from the Service Area was allocated, from 1946 to 1956, should be imputed to the plaintiff. The Government emphasizes that an officer employed by the plaintiff at the time of the execution of its contract with the United States knew or should have known the method of allocation that had been used by the Bureau of Reclamation and the Fish and Wildlife Service over the years, and that his knowledge should be ascribed to the plaintiff. Prior to the execution of the 1956 contract, there was a protracted period of negotiation between representatives of the plaintiff and

the Bureau of Reclamation. A principal deputy of the Bureau during this time was Maurice K. Strantz, who left his position with the Federal Government in August 1956 to become an employee of the plaintiff.[4] At the time he changed jobs, negotiations had closed but the contract had not yet been formally signed, Strantz attested the contract on September 10, 1956, as Secretary of the plaintiff Irrigation District. Although he was aware that interagency allocations had been made by the Bureau and the Service pursuant to their 1946 agreement, he did not know the manner in which the allocation was computed. Even if he should have discovered the method of apportionment while he was a federal employee, such hypothetical "knowledge" cannot, in turn, be imputed to the plaintiff, because Mr. Strantz did not begin working for the Irrigation District until after the negotiation of its contract with the defendant had been fully concluded. Such double imputation of knowledge of matters relevant to a transaction, after it has been virtually completed, is clearly impermissible. Cf. Restatement, Agency 2d, § 277 (1958).

■ The defendant next contends that plaintiff itself had constructive knowledge of the apportionment method previously in effect and, for that reason, must be deemed to have agreed to it. The method of computation now urged by defendant was consistently adhered to for ten years under the agreement between the Fish and Wildlife Service and the Bureau of Reclamation; by virtue of the relevant provision of its own contract

3. The amount of excess water resulting from Ady Canal imports is deemed by the Bureau to be that which remains unaccounted for after reducing the total amount removed by the maximum derived from Tulelake (which is the amount of water pumped through Plant D less 50,000 acre-feet). See finding 32.

4. Defendant emphasizes that for the first few weeks during which Strantz was working for the plaintiff in August 1956, he remained an employee of the Bureau of Reclamation as well, since he was being paid for his accrued annual leave.

Defendant does not urge this asserted "conflict of interest" as a bar to recovery, but it does argue the "conflict of interest" as an additional reason to impute knowledge of the method of interagency allocation to plaintiff. Aside from general doubts as to the interrelationship of conflicts of interest and imputed knowledge, we note that Strantz was only technically in the employ of the Bureau of Reclamation while he was on terminal leave. Such a technicality forms a wholly insufficient basis for the suggested imputation.

with the United States, plaintiff was necessarily aware that an allocation had been made from 1946–1956 under the interagency agreement, and it was likely that the United States planned to continue using the same method under the 1956 contract with plaintiff. Defendant infers from these facts that plaintiff could easily have dispelled any doubts concerning the proper method of computation by making the necessary inquiries beforehand, and that any additional costs which plaintiff must bear as a result of its failure to ask are its own fault.

This argument largely ignores the circumstances surrounding the negotiation of the 1956 agreement. That contract was executed only after a prolonged discussion, during which many complex problems required the careful attention of the parties. Because their agreement was essentially the last of a series of contracts between the United States and various irrigation districts in the Klamath Project, it was necessary for the Government to recover the remainder of its operational and maintenance costs through the contract with the plaintiff. The parties thus had to keep in mind not only their own particular needs—which were complicated enough—but also the interrelationship of the contract being negotiated with prior contracts between the United States and some twenty other irrigation districts and more than one hundred individual contractors in the Klamath Project. Finding 27(b). The clause now before the court was but one of many items with which the negotiators had to deal. In this setting, the defendant asks too much when it would require the plaintiff to have ascertained the administrative interpretation of every provision explicitly or implicitly incorporated by reference in its contract with the United States, even though these provisions appeared to be clear on their face. For this was not a situation in which the disputed provision is so patently ambiguous or confusing that the plaintiff had a duty to inquire. Cf. Jef-

ferson Constr. Co. v. United States, 151 Ct.Cl. 75, 89–91 (1960); Ring Constr. Corp. v. United States, 162 F.Supp. 190, 192, 142 Ct.Cl. 731, 734 (1958); Consolidated Eng'r Co. for Use of Fulton Nat. Bank of Atlanta v. United States, 98 Ct.Cl. 256, 280 (1943). On the contrary, the meaning of the provision allocating the cost of removing excess water from the Lower Klamath Lake Area was apparently so clear, at the time, to both parties that it was hardly even discussed. Plaintiff simply accepted the explanation of a representative of the defendant that "the Fish and Wildlife Service took care of the first 50,000 feet of water pumped through the Tulelake Tunnel, and the Bureau paid the remainder." Tr. 112. As shown later in this opinion, the words of the 1946 pact are easily susceptible of a rational application. In these circumstances, the plaintiff cannot be bound by the information it would have obtained had it made a special inquiry as to this particular provision (15(a) (iii) (ee) (2)), any more than the defendant can be criticized for not volunteering its special knowledge of the prior administrative interpretation. We refuse to impose such an excessive burden on the plaintiff.

■ Since plaintiff cannot be held to have accepted defendant's prior method of allocation, we must then decide whether some general canon requires us to acquiesce in plaintiff's version, or whether we must appraise the agreement for ourselves without the help of any general rule of construction favoring one side or the other. Under the interpretation sought by the plaintiff, the Fish and Wildlife Service would be charged (and plaintiff credited) with the cost of removing (1) the first 50,000 acre-feet of excess water from the Service Area and also (2) the amount imported into the Service Area from the Ady Canal. The cost of eliminating any additional water from the Lower Klamath Lake Area would be borne by the plaintiff. The bare words of the contract do not call upon the Service to shoulder the cost of eliminating excess water derived originally

from the Ady Canal, but plaintiff says that its construction of the disputed clause must nevertheless be accepted because of the principle that "if some substantive provision of a government-drawn agreement is fairly susceptible of a certain construction and the contractor actually and reasonably so construes it, in the course of bidding or performance, that is the interpretation which will be adopted—unless the parties' intention is otherwise affirmatively revealed." WPC Enterprises, Inc. v. United States, 323 F.2d 874 at 876, 163 Ct.Cl. 1, 6 (1963). See, also, Peter Kiewit Sons' Co. v. United States, 109 Ct.Cl. 390, 418 (1947); First-Citizens Bank & Trust Co. v. United States, 76 F.Supp. 250, 266, 110 Ct.Cl. 280, 310 (1948); Western Contracting Corp. v. United States, 144 Ct.Cl. 318, 326 (1958); W. H. Edwards Eng'r Corp. v. United States, 161 Ct.Cl. 322, 331–32; Freedman v. United States, 320 F.2d 359, 365, 162 Ct.Cl. 390, 401 (1963). But unlike those cases, we are not dealing with a contract authored exclusively by the Government.[5] Far from being a contract of adhesion, the 1956 agreement was virtually co-authored during a period of lengthy negotiations. Although the disputed provision, incorporated by reference from the 1946 interagency pact, was of course drawn by the defendant, it was subject to the plaintiff's scrutiny in 1956 and could have been modified at that time. Where a contract with the United States is as fully negotiated and bargained for as this one, the principle that ambiguities must be construed against the Government is inapposite. See Deloro Smelting & Refining Co. v. United States, 317 F.2d 382, 386, 161 Ct.Cl. 489, 495 (1963).

■ It follows that, since no general canon of interpretation provides a ready solution, we are to determine what method of computation is the most reasonable, in the light of the language of the contract and the circumstances of its creation. First, as we have already noted, plaintiff's suggestion that the Fish and Wildlife Service be charged with the cost of removing the water it imports into the Lower Klamath Lake Area via the Ady Canal finds no support in either the provisions of its contract with the defendant or those of the earlier interagency agreement. Although that might have been a fair bargain for the parties to make, it was not the one they made. The 1956 contract explicitly states that plaintiff is to pay "*100%* of the cost of operation and maintenance of the P Canal, the Klamath Straits Drain, and Pumping Plants E and F" (emphasis added.) The last three of these facilities are the sole means of removing excess water from the Service Area.[6] There is no exception from this 100% burden for the expense of removing excess water which comes from the Ady Canal. If the Fish and Wildlife Service is to pay the cost of removing water imported into the Service Area from the Ady Canal, the sole basis would have to be the credit given plaintiff for the charges borne by that Service under the 1946 interagency agreement. But these incorporated provisions state only that the Fish and Wildlife Service is to bear the expense of removing the first 50,000 acre-feet of excess water brought through Tulelake Tunnel into the Service Area. Nothing is said about Ady Canal water, and there is no other relevant stipulation for charging expenses to the Service. Although the Bureau of Reclamation gave particular thought to whether the Service's responsibility for sharing the cost of removing excess water should include excess water contributed by the Service's operation of the Ady Canal, and this possibility was the subject of some proposals

---

5. In Peter Kiewit Sons' Co. v. United States, supra, the parties did negotiate concerning the price term of the contract, but all the other terms, including the specifications and other details of performance, were drawn by the Government.

6. As has been previously noted, the P Canal brings water to the Lower Klamath Lake Wildlife Refuge or Area, and also carries water to irrigate the "P Canal lands" outside the Area.

for amendment, the modification finally adopted in the 1946 agreement failed to make any provision for it. Finding 18. Since these expenses could not be billed to the Fish and Wildlife Service under the 1946 agreement, the plaintiff is likewise not entitled to have them charged to the Service under its contract. The cost of eliminating excess water originally brought into the Service Area via the Ady Canal must therefore be assumed by the Irrigation District.

We are left with the divergent views of the parties as to what was meant by the clause of the interagency contract charging the Fish and Wildlife Service with "the cost of removing from the Service Area the *first* 50,000 acre-feet of such water brought through Tule Lake tunnel annually * * * which is determined to be in excess of the * * * normal capacity." Defendant contends that measurement of the first 50,000 acre-feet "brought through Tule Lake tunnel" must be at the point it reaches the tunnel, i. e. after the water leaves Pumping Plant D and before it ever enters the Lower Klamath Lake Area. Plaintiff, on the other hand, asserts that the cost of removing the first 50,000 acre-feet of water, in excess of normal capacity, from the Service Area can only be ascertained by measuring the excess water as it leaves the Service Area.

Though the point is not wholly free from doubt, we think the plaintiff's construction is the more reasonable. The disputed provision refers to the amount of water brought through Tulelake Tunnel, but it places primary emphasis on apportioning the cost of removing excess water from the Lower Klamath Lake Area. It should therefore be construed as referring only to water brought through the tunnel *and into the Lower Klamath Lake Area*. Under the defendant's interpretation, as we have pointed out, the cost of removing the first 50,000 acre-feet from the Service Area is ascertained by using a measurement which includes water never even reaching the Service Area. This is because some of the water entering Tulelake Tunnel and

the P Canal through Plant D is used for the irrigation of adjacent lands and, as a result, does not enter the Lower Klamath Lake Area. By subtracting 50,000 acre-feet from the total amount of water pumped through Plant D and charging plaintiff on the basis of the remainder, the defendant includes this water for the "P Canal lands", which never comes into the Service Area, as part of the excess water taken from the Area—and the Irrigation District is then charged for this outside water. This method of allocation does not square with the language and purpose of the incorporated provision. That clause strongly suggests that, up to 50,000 acre-feet, water which came from Tulelake Sump should be considered the *first* of the excess water removed from the Service Area.

In the discussions preceding the present litigation after the dispute arose, the defendant's representatives relied wholly on their understanding of the intention of the parties to the interagency agreement, as shown by the pre-agreement negotiations and the subsequent administrative interpretation of the agreement from 1946–1956. Defendant chose to disregard the actual language of the agreement as "the unhappy product of an uninformed scrivener" who "simply did not have an understanding of the problem sufficient to enable him to draft an accurate memorandum of the actual agreement of the parties." Finding 43. As we have held, however, knowledge of "the actual agreement of the parties" to the interagency pact may not be imputed to this plaintiff. Rather, it is the 1946 contract as written which must control, and we find the plaintiff's interpretation, in this respect, more consonant with the words the two agencies used than the looser construction urged by the defendant. The interagency agreement states that the Fish and Wildlife Service is to be charged "with the cost of removing from the Service Area the *first* 50,000 acre-feet of * * * water brought through Tule Lake tunnel annually and which is determined to be in excess of the * * * normal capac-

ity."[7] To the extent that plaintiff's position embodies that requirement, we agree. The contract requires the plaintiff to bear all the expense of removing excess water from the Lower Klamath Lake Area (including water imported from the Ady Canal) less the cost of eliminating the first 50,000 acre-feet (if that much water has come through Tulelake Tunnel during the year) which is to be charged to the Fish and Wildlife Service.

The plaintiff is entitled to recover the difference between the amount it actually paid defendant and that which it should have paid under this interpretation. Under this method of computation—which differs from those proposed by the parties—the United States has overcharged the plaintiff as follows (see finding 41(c)):

| 1957 | $ 4,644.84 |
|------|-----------|
| 1958 | 17,044.39 |
| 1959 | 312.93 |

$22,002.16

Although the method of cost allocation adopted by the court may possibly not be what was subjectively contemplated by either party at the time of the execution of the 1956 contract, we think that it most accurately reflects the agreement into which they actually entered. Under the objective theory of contracts, this interpretation must prevail in the absence of some other external manifestation of a mutual understanding. Should the parties wish to amend the contract so as to better express the subjective intent of either or both, or to substitute some new formula, they are of course free to do so.

Plaintiff is entitled to recover $22,002.16, and judgment is entered to that effect.

52 CCPA

7. The 1946 agreement did not precisely define the water "which is determined to be in excess of the aforesaid normal capacity", but we think that the parties to the 1956 contract have understood, correctly, that the water annually removed through the Klamath Straits Drain constitutes such "excess". In effect, the Fish and Wildlife Service has determined that that amount of water is "in excess of the normal capacity of the Service" and should be "remove[d] in order to permit the efficient carrying on of the Service's functions."