**RANDALLSTOWN PLAZA ASSOCIATES**

v.

**The UNITED STATES.**

**No. 333–86C.**

United States Claims Court.

Nov. 13, 1987.

Richard B. Nettler, Washington, D.C., for plaintiff.

David B. Stinson and Donald E. Kinner, Washington, D.C., with whom was Asst. Atty. Gen., Richard K. Willard, for defendant.

## OPINION

MARGOLIS, Judge.

Plaintiff brought this action challenging the contracting officer's denial of plaintiff's claim, which seeks a rent increase that plaintiff contends is required by the terms of the lease. Both parties agree that there are no disputed issues of material fact, and this action now comes before the court on cross motions for summary judgment. After reviewing the record and after hearing oral argument, plaintiff's motion for summary judgment on the issue of liability is granted, and defendant's motion for summary judgment is denied.

## FACTS

Early in the summer of 1979, the General Services Administration (GSA) began searching for office space in the Randallstown, Maryland area. On August 1, 1979, the GSA issued Solicitation No. 79–49, which requested offers to lease approximately 4,100 square feet of net usable office space in the Randallstown area. Paragraph 10 of Schedule AA of the solicitation, the real estate tax and operating cost escalation clause, provided that the government would pay, as "additional rent," real estate tax increases and operating expenses. Operating expenses were to be adjusted annually according to changes in the cost of living index occurring since the commencement of the lease term. In the event an option to renew was exercised, paragraph 10 provided that the additional rent applicable to the original term would be adjusted to take account of increases or decreases that occurred during the original term, with annual adjustments made thereafter.

Plaintiff responded to this solicitation with an offer, on GSA form 1364, to lease 4,292 square feet of office space at the Randallstown Plaza Shopping Center for a five-year term at $31,190 per year. Paragraph 2 of the offer sets forth the base rent for both the initial term and for any renewal terms. GSA form 1364 calculates base rent by multiplying the amount of net usable space (measured in square footage) by a proposed rate per square foot per year. Paragraph 2(1) indicates there were 4,292 square feet of net usable office space. The offered square foot rate per year in paragraph 2(2) was $7.50. The product of these two numbers yields the base rent subtotal of $31,190 per year in paragraph 2(3). The offer also provides for two five-year renewal options. The renewal terms are set forth in paragraphs 2(4) and 2(5) of the offer as:

Renewal Term(s)

(4) Sq. Ft. Rate Per Year

$ Rent in first yr. of term increased per C.P.I.

As a note to paragraph 2(4), the lease instructs the offeror to multiply the renewal rate by the total amount of square footage offered, as shown in paragraph 2(1), to calculate a renewal subtotal for paragraph 2(5). Plaintiff inserted a question mark

following the dollar symbol in paragraph 2(5) for the renewal subtotal.

The offer also requests that the lessee be liable for other payments as well. Paragraph 7 of the offer lists a number of additional responsibilities for which the government as lessee would be liable, including operating expenses and increases in real property taxes. Paragraph 7(1) estimates operating expenses to be an additional 20 cents per square foot per year, which would be "paid monthly with rent."

Negotiations between the parties ensued and on October 30, 1979, GSA accepted plaintiff's August 21, 1979 offer. Accompanying GSA's acceptance was an executed lease dated October 30, 1979 setting total annual rent at $33,048.36. This figure was reached by adding the estimated 20 cents per square foot per year for operating expenses, set forth in paragraph 7, to the $7.50 per square foot per year of the base rent, set forth in paragraph 2(2). The total, $7.70, was then multiplied by the number of square feet, 4,292, to reach $33,-048.36. Paragraph 7 of the lease specifically incorporates plaintiff's offer, GSA's solicitation, and the accompanying schedules as part of the lease. Paragraph 5 of the lease, written by the defendant, concerns the terms of renewal. It provides:

> Two (2) five (5) year renewal options at the annual rental being paid at the end of the initial 5 years, and at the end of the first renewal option, as adjusted at the end of each one of these periods in accordance with the tax and operating cost escalation clauses....

The tax and operating cost escalation clause, paragraph 10 of Schedule AA, provides that operating cost expenses will rise or fall according to changes occurring in the Consumer Price Index (CPI) over the past year. As a result, while the base rent remained at $31,190 throughout the entirety of the first term of the lease, the amount due for operating expenses rose yearly according to increases in the CPI.

A supplemental lease agreement executed on January 24, 1980, established the term of the lease as beginning on that date and ending at midnight, January 23, 1985.

On July 26, 1984, GSA exercised its first renewal option. On April 15, 1985, a second supplement to the lease was executed. This supplement adjusted certain inaccuracies in prior tax and operating cost escalations and also recalculated the base rate for operating expenses as provided for in the last clause of paragraph 10 of Schedule AA. Plaintiff signed the second supplement on May 16, 1985, but also indicated that, based on changes in the CPI over the preceding five years, commencing February 1, 1985 the base rent had been raised to $44,230.83 as provided for in paragraph 2(4) of the offer. Defendant refused to pay rent in that amount claiming that the renewal terms in the lease provided only for increases in taxes and operating costs, and the base rental for each renewal option was the same as the base rent for the original term.

Plaintiff filed a claim with the contracting officer on December 20, 1985, seeking recovery of the rental deficiencies and a decision fixing the base rent at the CPI-escalated level. The contracting officer denied plaintiff's claim. Plaintiff then filed this action challenging the contracting officer's decision.

The parties' positions are as follows: Plaintiff contends that paragraph 2(4) of the offer clearly contemplates an increase in base rent pursuant to changes in the CPI. Plaintiff states that it reasonably understood paragraph 5 of the lease as incorporating paragraph 2(4) of the offer, that is, increasing base rent "in accordance with" the escalator clause, which is keyed to the CPI. Plaintiff argues that any ambiguity is a result of paragraph 5, and such ambiguity must be construed against the defendant, the drafter of paragraph 5.

Defendant disagrees with plaintiff's characterizations of both contractual provisions. Defendant contends that it understood "rent" in paragraph 2(4) of the offer as applying only to "additional rent," that is, operating expenses. Defendant claims that, in line with this understanding, paragraph 5 of the lease provides for rent to be increased "in accordance with" paragraph 10 of Schedule AA, the tax and operating

cost escalation clause. Defendant argues that because paragraph 10 only deals with tax and operating expenses, paragraph 5 of the lease must also only pertain to adjustment of operating expenses. Defendant maintains that any ambiguity is a result of paragraph 2(4), and such ambiguity must be construed against the plaintiff, the drafter of paragraph 2(4).

## DISCUSSION

To borrow from the language of *WPC Enterprises, Inc. v. United States*, 163 Ct.Cl. 1, 3, 323 F.2d 874, 875 (1963):

This is a study in the toils of ambiguity. The parties have put their names to a contract which, on the point crucial to this lawsuit, [the parties] read in two conflicting fashions. Each signatory seized in its own mind upon a different one of these contradictory versions. Compounding that confusion, ... each thought ... it had obtained the other's acquiescence in its chosen meaning. The impasse became unmistakably plain when it was too late. Our task is to determine on whom should fall the risk of such mutually reinforced obscurity.

The court's first responsibility is to attempt to interpret the lease in an effort to determine what the parties agreed to in their bargain. *See Salem Engineering & Construction Corp. v. United States*, 2 Cl.Ct. 803, 806 (1983). Of course, each party believes that its own interpretation of the lease is the only reasonable interpretation. The interpretation of a lease, however, as with any other contract, is a question of law to be decided by the court. *See B.D. Click Co. v. United States*, 222 Ct.Cl. 290, 297, 614 F.2d 748, 752 (1980); *Opalack v. United States*, 5 Cl.Ct. 349, 359 (1984); *D & S Universal Mining Co. v. United States*, 4 Cl.Ct. 94, 96 (1983).

In an ideal world, each party's intentions would always be expressed in great clarity and precision. However, so long as language remains fluid and flexible, the rules of grammar esoteric, and human prescience limited, varying interpretations of contractual language are inevitable. It has often been stated that a court should interpret the contractual language in a manner that gives meaning to all parts of the contract in such a way that the parts do not conflict with one another, if possible. *See B.D. Click*, 222 Ct.Cl. at 299, 614 F.2d at 753. In doing so, a court must consider both the context of the language and the interpretation of the contracting parties. *Firestone Tire & Rubber Co. v. United States*, 195 Ct.Cl. 21, 30, 444 F.2d 547, 551 (1971) (stating that "the intention of the parties to a contract control its interpretations"); *Rice v. United States*, 192 Ct.Cl. 903, 908, 428 F.2d 1311, 1314 (1970).

It is well settled that "the language of a contract must be given that meaning that would be derived from the contract by a reasonably intelligent person acquainted with the contemporaneous circumstances." *See Hol–Gar Manufacturing Corp. v. United States*, 169 Ct.Cl. 384, 388, 351 F.2d 972, 975 (1965); *John C. Grimberg Co. v. United States*, 7 Cl.Ct. 452, 456, *aff'd*, 785 F.2d 325 (1985). This situation frequently results in the court, when considering the contract language, placing itself, often many years after the signing of the contract, in the position of a "reasonable and prudent" contractor. *Firestone*, 195 Ct.Cl. at 30, 444 F.2d at 551; *Grimberg*, 7 Cl.Ct. at 456.

If the court finds that only one reasonable interpretation of the lease is possible, the court's inquiry is at an end. *See Cherry Hill Sand & Gravel Co. v. United States*, 8 Cl.Ct. 757, 767 (1985). The single reasonable interpretation will be applied. A contract is ambiguous if it is susceptible to more than one reasonable interpretation. *See Bennett v. United States*, 178 Ct.Cl. 61, 64, 371 F.2d 859, 861 (1967); *Opalack*, 5 Cl.Ct. at 359. However, contract terms are not rendered ambiguous merely because the parties disagree as to the contract's meaning. *Cherry Hill*, 8 Cl.Ct. at 764.

■ Although the parties in this case disagree as to the meaning of the contract, when this court steps into the shoes of a reasonable and prudent businessperson aware of the situation, a plain reading of the contract as a whole seems to yield only one reasonable interpretation. Paragraph

2(4) of the offer, as a binding component of the lease, sets forth a formula for increasing base rent for the two renewal periods. Defendant argues that paragraph 2(4) of the lease should logically be interpreted as applying only to an increase in operating costs, and not to an increase in base rent. Defendant argues that this interpretation is wholly consistent with paragraph 5 of the lease.

This court disagrees with the defendant's construction of the contract and finds the defendant's interpretation of paragraph 2(4) of the offer is not justified in light of the plain meaning of paragraph 2(4). The context of plaintiff's language in paragraphs 2(4) and 2(5), together with a plain reading of that language, give rise to only one conclusion that a reasonably intelligent businessperson aware of the situation could reach: that plaintiff's offer proposed an increase in base rent for renewal periods dependent upon changes in the CPI. Defendant accepted plaintiff's offer, and it was incumbent upon defendant, as author of the lease, to lucidly present the terms of the offer in the lease. *See WPC Enterprises, Inc.*, 163 Ct.Cl. at 6, 323 F.2d at 877. To the extent that the defendant failed to do so, and thereby allowed plaintiff to reasonably interpret the language of the lease as incorporating the relevant terms of the offer, plaintiff's interpretation of the contract must be applied.

It is not appropriate for the court to strain the language of a contract to create an ambiguity. *Opalack*, 5 Cl.Ct. at 359. To adopt defendant's construction of paragraph 2(4) would force this court to strain the plain language of the offer. Paragraph 2(4) of the offer is not ambiguous. The language is straightforward, the formula for calculating the rent is clear, and, from what the court can determine, the government accepted the plaintiff's offer in full.* In fact, the offer was incorporated as a binding part of the lease. Further, paragraph 2 of the offer deals solely with calculating base rent, not operating costs.

This fact is reinforced by that fact that paragraphs 2(3) and 2(5) of the offer, which list the amount of rent for the initial and renewal terms, deal with "subtotals"—they are subtotals because operating costs and other payments are *not* included in paragraph 2, but are set forth in paragraph 7 of the offer. As such, the only reasonable interpretation of plaintiff's renewal terms in paragraph 2(4) is that plaintiff was proposing an increase in *base rent* that was keyed to changes in the CPI. An entirely separate section of the offer contained the proposal for the payment of operating costs and the details about such payments.

Although there is only one reasonable interpretation of the renewal terms in the offer, the contract must be read as a whole when divining its meaning. Nevertheless, this court finds that such an interpretation of the offer does not conflict with any other provision in the contract. Defendant alleges that paragraph 5 of the lease is unequivocal in providing only for an increase in taxes and operating costs and not for base rent. Defendant's interpretation of paragraph 5 does not alter, or even contradict, the plain language of the offer. Plaintiff argues that paragraph 5 is ambiguous in that it can be read in two contradictory fashions. Even by adopting the defendant's view of paragraph 5 as the only reasonable interpretation, paragraph 5 serves only to restate the workings of paragraph 10 of Schedule AA, dealing with escalation of operating costs. Such a reading of paragraph 5 does not preclude an increase in base rent as set forth in paragraph 2(4) of the offer. Applying the defendant's interpretation of paragraph 5, the two provisions do not overlap, they speak to different things. Paragraph 2(4) of the offer deals solely with base rent while paragraph 5 of the lease deals with additional rent, namely, taxes and operating costs.

Furthermore, defendant's argument that plaintiff's base rent renewal terms, if plaintiff's interpretation is applied, constitutes a

---

* In this regard, the court notes that the plaintiff's offer was the only offer GSA received in response to its solicitation.

deviation from the terms of the solicitation is without merit. In reference to renewal terms, the solicitation provides only: "Negotiations will be conducted to obtain the most reasonable rental offer possible for both the initial term and the renewal period." Schedule DD at ¶ 7. Plaintiff's offer did not deviate from any of the solicitation's provisions. GSA form 1364, on which the plaintiff was requested to submit its offer, specifically requests renewal terms in paragraphs 2(4) and 2(5). Plaintiff supplied those terms, not in the typical absolute dollar amount, but rather, tied to changes in the CPI. For that reason, plaintiff inserted a question mark in place of the renewal subtotal because the subtotal could not be ascertained until the initial term had elapsed, and CPI figures then were available.

Defendant's argument that plaintiff's interpretation of its offer constitutes a change in the lease and that plaintiff was required to note such a change in paragraph 8 of the lease is also without merit. Defendant claims: "While Randallstown could have proposed a square footage rate for the renewal period different from the rate for the intitial [sic] period, it was incumbent upon plaintiff to state in no uncertain terms the amount of that rate. This plaintiff failed to do." Def.Reply at 3–4. Defendant is mistaken. Plaintiff expressly proposed a square footage rate different from the rate for the initial period. Plaintiff provided an explicit formula for increasing the base rent: rent for the initial term increased by the CPI. This formula does not constitute a change in the lease that would require notice in paragraph 8.

After an extensive study of the contract language and the context of the language, this court finds that given the unreasonableness of the defendant's interpretation of the contract, and reading the contract as a whole, including paragraph 2 of the offer and paragraph 5 of the lease, there is no ambiguity in the contract. Therefore, plaintiff's interpretation, the only reasonable interpretation of the contract, must control. *See Blake Construction Co. v. United States,* 220 Ct.Cl. 56, 60 n. 16, 597 F.2d 1357, 1359 n. 16 (1979); *Cherry Hill,* 8 Cl.Ct. at 767. That interpretation provides both for a change in base rent pursuant to paragraph 2(4) of the offer and an increase in operating costs pursuant to paragraph 5 of the lease and paragraph 10 of Schedule AA. Therefore, plaintiff is entitled to an increase in base rent according to the increase in the CPI during the initial term of the lease. Plaintiff is also entitled to an adjustment in operating costs as provided for in paragraph 10 of Schedule AA.

■ Even if the language of the offer were strained so as to allow more than one reasonable interpretation of paragraph 2(4), thereby rendering the provision ambiguous, plaintiff's interpretation of the contract would still be applied. In reviewing a contract that involves a non-patent ambiguity, a court will attempt to apply the well-established rule of *contra proferentem.* *See Chris Berg, Inc. v. United States,* 197 Ct.Cl. 503, 514, 455 F.2d 1037, 1044 (1972); *Temple v. United States,* 11 Cl.Ct. 302, 306 (1986). This rule requires that a court construe an ambiguity against the drafter of the contract if the non-drafting party's interpretation is reasonable. *See Mountain Home Contractors v. United States,* 192 Ct.Cl. 16, 20–21, 425 F.2d 1260, 1263 (1970); *Cherry Hill,* 8 Cl.Ct. at 767.

■ Even assuming *arguendo* that defendant's interpretation of the offer was not unreasonable and, therefore, two reasonable interpretations of the contract could be sustained, this court would again reach the conclusion that the plaintiff's interpretation of the contract's renewal term should be applied. In applying the rule of *contra proferentem,* it is presumed that both parties possess at least a minimal amount of business sense. *Franklin Co. v. United States,* 180 Ct.Cl. 666, 672, 381 F.2d 416, 419 (1967). This presumption places a special burden on the drafting party who must bear the risk of any contractual uncertainties or ambiguities. *See Grimberg,* 7 Cl.Ct. at 456. The drafter of the contract "has to shoulder the major task of seeing that within the zone of rea-

sonableness the words of the agreement communicate the proper notions...." *WPC Enterprises, Inc.*, 163 Ct.Cl. at 6, 323 F.2d at 877. Because the drafter of the contract has the burden of clarification, "it must bear the risk of an insufficient attempt, even though the [other party's] obtuseness likewise contributed to the ... misunderstanding." *Id.* at 11, 323 F.2d at 879.

■ To apply the rule of *contra proferentem*, it is necessary to be able to identify the drafter of the ambiguous provision. *See* J. Cibinic & R. Nash, *Administration of Government Contracts* 158 (2d ed. 1985). Most frequently, the cases in which *contra proferentem* is applied concern an ambiguity in government-drafted contracts or specifications. This case presents a twist, however, in that, if defendant's interpretation is reasonable, ambiguities emerge in both the plaintiff's offer and in the government-drafted lease, both of which are incorporated into the contract and are to be read together as a whole. Of the two provisions that the parties believe are ambiguous, one was drafted by the plaintiff and the other by the defendant.

■ If both parties' interpretations of the contract are reasonable, it renders both of the identified contractual provisions ambiguous. *See Opalack*, 5 Cl.Ct. at 359. Because each party drafted one of the provisions, it follows that each must shoulder part of the responsibility for the resulting ambiguities. *WPC Enterprises, Inc.*, 163 Ct.Cl. at 6, 323 F.2d at 876–77. Plaintiff would be responsible for ambiguities in the offer, while defendant would be liable for ambiguities in the lease. If both parties' interpretations are reasonable, *contra proferentem* would have to be applied to both interpretations. Paragraph 2(4) of the offer would be construed against the plaintiff, allowing defendant's interpretation of that provision to be enforced. At the same time, paragraph 5 of the lease would be construed against the defendant, allowing plaintiff's interpretation of that provision to be enforced. The resulting stalemate does not afford a solution to the dispute. Therefore, this court reaches the conclu-

sion that if both parties' interpretations are assumed to be reasonable, due to the divided authorship of the ambiguous provisions, the rule of *contra proferentem* cannot properly be applied to this case.

This case presents a situation that is analogous to the situation in which there is not a single identifiable draftsperson. *See Tulelake Irrigation District v. United States*, 169 Ct.Cl. 782, 792, 342 F.2d 447, 453 (1965) (refusing to apply *contra proferentem* where each party authored a portion of the contract). Because the provisions in this contract are ambiguous when read together and each provision was drafted by one of the parties, the requirement that there be a single identifiable draftsperson of the contract cannot be met. Both parties provided some language to the contract, each secure in its own interpretation, and seemingly oblivious to the alternative interpretations to which the language was susceptible.

■ In cases where the *contra proferentem* rule cannot be applied, the contract must be interpreted as it would be understood by a reasonably intelligent person familiar with the circumstances at the time of contracting. *Deloro Smelting and Refining Co. v. United States*, 161 Ct.Cl. 489, 495, 317 F.2d 382, 386 (1963). Or, as the Court of Claims in *Tulelake Irrigation District* opined when faced with a similar situation: "It follows that, since no general canon of interpretation provides a ready solution, we are to determine what method of computation is the most reasonable, in light of the language of the contract and the circumstances of its creation." 169 Ct.Cl. at 793, 342 F.2d at 453. Thus, the court is confronted with a balancing test to determine which interpretation of the renewal provision is the more reasonable one. This analysis is very similar to the foregoing inquiry used by the court in determining that plaintiff's interpretation was the only reasonable one.

Because neither party's interpretation is entitled to the benefits of *contra proferentem*, each interpretation must stand or fall on its own strengths or weaknesses. While it may very well have been prudent for plaintiff to seek clarification of paragraph 5 of the lease, plaintiff's interpreta-

tion of the contract is reasonable, supported by the language contained in the offer, and not contradicted by any other contractual provisions. However, as indicated earlier, defendant's construction of the contract, and especially paragraph 2 of the offer, strains the language of the contract. While for the purpose of argument the court has assumed defendant's interpretation of the contract is reasonable, plaintiff's interpretation is more reasonable. As such, the plaintiff's interpretation of the contract must control.

## CONCLUSION

After an extensive review of the entire record, the court concludes that plaintiff is entitled to an increase in base rent according to changes in the CPI from January 24, 1980 to January 23, 1985. Plaintiff is also entitled to a similar increase in operating costs pursuant to paragraph 10 of Schedule AA. Accordingly, the plaintiff's motion for summary judgment on the issue of liability is granted, and the defendant's motion is denied.

Within 12 days from the date of this opinion, the parties shall file with the Clerk's Office a proposed stipulation setting forth plaintiff's damages so that judgment can be entered for plaintiff for the rent deficiency accruing from January 24, 1985 to the present, together with interest, computed in accordance with the Contract Disputes Act, 41 U.S.C. § 611.