**Paul OPALACK, formerly trading as Opalack & Company and Randall H. Ritchey and David L. Cotton**

v.

**The UNITED STATES.**

**No. 618–81C.**

United States Claims Court.

May 15, 1984.

Pamela J. White, Baltimore, Md., for plaintiffs; Jervis Spencer Finney and Ober, Kaler, Grimes & Shriver, Baltimore, Md., of counsel.

Beacham O. Brooker, Jr., U.S. Dept. of Justice, Civ. Div., Commercial Litigation Branch, Washington, D.C., with whom was Asst. Atty. Gen. J. Paul McGrath, Washington, D.C., for defendant.

ON CROSS–MOTIONS FOR
SUMMARY JUDGMENT

OPINION

SPECTOR, Senior Judge.

The contract dispute involved in this case has previously been the subject of two intermingled administrative decisions within the Department of Labor. The second decision was required as the result of obvious procedural irregularities in rendering the first. It is necessary at the threshold to analyze in general terms the subject matter and nature of these decisions in order to establish the jurisdiction of this court to review them and the standards to be applied in that review.

The first of these decisions is captioned:

In the Matter of
Suspension and Proposed Debarment
of
OPALACK AND COMPANY
from participation in contracting
or subcontracting with the
UNITED STATES DEPARTMENT OF
LABOR

It is entitled "Decision and Order", is printed on letterhead of the United States Department of Labor, Board of Contract Appeals, and bears a "BCA" docket number. The first sentence reads as follows:

This is a proceeding for *debarment* of a Government contractor pursuant to the Federal Procurement Regulations (41 CFR Subpart 1–1.6), *joined with* the contractor's *appeal from a termination for default.* [Emphasis supplied.]

The "Decision and Order" is signed by a single Administrative Law Judge (ALJ). He states therein:

* * * On January 4, 1979, the Department issued a notice of proposed Department-wide debarment of the Contractor for a period of three years pursuant to

41 CFR Subpart 1–1.6, together with notice of immediate suspension under the provisions of 41 CFR § 1–1.605.

The Contractor thereupon *requested a hearing upon the action taken under the above notice dated January 4, 1979* [debarment], and such hearing was duly held on all issues *before the undersigned,* to whom the Secretary of Labor duly delegated the *authority to make a final decision* for the Department *on the said suspension and debarment.* * * * [Emphasis supplied.]

The "Decision and Order" of ALJ Feldman further recites that it was based on a seven-day hearing and 1,200 pages of transcript plus exhibits. He concluded that the "notice of suspension did not comply with applicable Regulations" and further "that the evidence adduced at the hearing did not warrant suspension * * * ". He issued an order terminating the suspension "and deferring determination of all other issues until after receipt and consideration of the entire record and the briefs of respective counsel." The remainder of the "Decision and Order" recites the facts and issues which he thereafter developed together with his findings which included a determination that the debarment was justified.

However, he also concluded (and here's the rub) that the termination for default by the contracting officer of one of the two contracts here involved was proper. The notice of hearing which preceded the decision was, as above indicated, addressed solely to the *debarment* issue, and ALJ Feldman had characterized himself as a single representative of the Secretary of Labor to address that issue under the applicable regulations. Below his signature on the "Decision and Order" appears the following:

N.B.—Decision on *Appeal from Termination* is endorsed on next page. [Emphasis supplied.]

On the next page it is stated:

Upon *such of the foregoing findings* of fact and conclusions of law *as are pertinent to the appeal, the termination of Contract* No. J–9–D–7–0148 *for*

*default of the Contractor* is hereby in all respects affirmed. [Emphasis supplied.]

Department of Labor
Board of Contract Appeals *

Robert J. Feldman
Panel Chairman

Robert L. Ramsey
Panel Member

* A third member of the Panel is no longer employed by this office and did not participate in the hearing, consideration or decision of this proceeding.

This treatment of the default termination issue was contrary to the notice of hearing and the agreement made at the outset of the hearing on suspension and debarment. Both parties and ALJ Feldman had agreed that the only issues to be determined at that hearing were suspension and debarment. At that time, Opalack and Co. had not even filed an appeal to the Labor Department's Board of Contract Appeals from the contracting officer's decision terminating one of the contracts for default. The Labor Department's attorney and ALJ Feldman had agreed to permit an appeal on that issue to the BCA at a later time, and the record clearly indicates that a separate and later hearing was contemplated on the default termination issue. ALJ Feldman had nevertheless rendered a decision on both the debarment and termination issues, while hearing evidence directed to only one of those issues. There was an effort to rectify this problem by signing the opinion twice, once as a single representative of the Secretary of Labor on the debarment issue, and a second time as a member of a panel of the Department's Board of Contract Appeals, which another member also signed.

The plaintiffs herein then moved that the issue of the propriety of the default termination be reopened and reconsidered. The motion was granted and additional evidence was taken, following which a very brief decision was rendered by the same two members of the BCA. It concluded:

Appellants have not shown on the reopening that there was any error or infirmity in the original decision. The affirmance of the termination * * * for default of the Contractor is therefore confirmed.

■ In view of the foregoing, the issue of the propriety of the default termination is being reviewed here on the basis of both of the two administrative decisions above described and their underlying records. The case is brought under the Tucker Act [1] and it is not eligible for review under the Contract Disputes Act [2] because the claim was no longer pending before the contracting officer on the effective date of that Act or thereafter. It is therefore being reviewed by this court rather than by the Court of Appeals for the Federal Circuit,[3] and the standards of review to be applied are those set forth in the Wunderlich Act.[4] The review is on cross-motions for summary judgment, in accordance with the then applicable rules.

### Statement of Facts [5]

This contract dispute arises out of two contracts between the Department of Labor (DOL), Office of Accounting, and Opalack and Co. (Opalack), an accounting firm. The first of these contracts was No. J–9–D–6–0191 (191), dated September 14, 1976. Pursuant thereto, Opalack was to audit certain DOL grants and contracts in the States of Indiana, Iowa, Michigan, Mississippi, Missouri, North Carolina, Ohio, Oklahoma, Texas, and the Washington, D.C. metropolitan area. The second contract, No. J–9–D–7–0148(148), dated September 26, 1977, involved the audit of DOL grantees under the Comprehensive Employment & Training Act (CETA) in four geographical regions. Contract 191 was in the amount of $318,060, and the stated amount of contract 148 was $223,648.

At all times pertinent to this proceeding, Opalack was a partnership, comprised of Paul Opalack, senior or managing partner, and three other partners, Randall H. Ritchey, David Cotton, and Lucian LiPera. Messrs. Opalack and Ritchey were certified public accountants (CPAs), licensed in Virginia and Maryland respectively. Messrs. LiPera and Cotton were accountants with MBA degrees, but were not CPAs. The partnership maintained its principal office

1. 28 U.S.C. § 1491(a)(1).

2. "Notwithstanding any provision in a contract made before the effective date of this Act, the contractor may elect to proceed under this Act with respect to any claim pending then before the contracting officer or initiated thereafter." Pub.L. No. 95–563, 92 Stat. 2386, at § 16. (Set out as a note under 41 U.S.C. § 601.)

3. Tucker Act jurisdiction was transferred from the United States Court of Claims to the United States Claims Court by the Federal Courts Improvement Act of 1982, Pub.L. No. 97–164, 96 Stat. 40, at § 133. (Codified at 28 U.S.C. § 1491(a)(1), 1982.)

4. 68 Stat. 81, 41 U.S.C. §§ 321 and 322 (1964 ed.):

   "§ 321. *Limitation on pleading contract-provisions relating to finality; standards of review*
   "No provision of any contract entered into by the United States, relating to the finality or conclusiveness of any decision of the head of any department or agency or his duly authorized representative or board in a dispute involving a question arising under such contract, shall be pleaded in any suit now filed or to be filed as limiting judicial review of any such decision to cases where fraud by such official or his said representative or board is alleged: *Provided, however,* That any such decision shall be final and conclusive unless the same is fradulent [1] or capricious or arbitrary or so grossly erroneous as necessarily to imply bad faith, or is not supported by substantial evidence.

   "[1] So in original. Probably should read 'fraudulent'."

   "§ 322. *Contract-provisions making decisions final on questions of law*
   "No Government contract shall contain a provision making final on a question of law the decision of any administrative official, representative, or board."

5. This recitation of the facts relies almost exclusively upon the Board's (ALJ's) findings of facts in the two opinions earlier described. In certain instances, facts which are fully supported in the record but not mentioned in the Board's (ALJ's) opinions have been included for clarification. See *Sherwin v. United States,* 193 Ct.Cl. 962, 979, 436 F.2d 992 (1971); *Ray D. Bolander Co. v. United States,* 186 Ct.Cl. 398, 409 n. 11 (1968); *Maxwell Dynamometer Co. v. United States,* 181 Ct.Cl. 607, 631, 386 F.2d 855, 870 (1967).

in Washington, D.C., although the firm was not licensed in the District of Columbia. It later moved to Alexandria, Virginia.

In the proposal to provide audit services, which culminated in contract 148, the firm characterized itself as a "Certified Public Accounting Partnership specializing in the provision of professional audit and consulting services to the public sector". Except for designating Paul Opalack as the partner-in-charge, members of the firm were not identified as such. Ritchey was designated as "colleague manager", LiPera as "programmatic consultant", and Cotton as a "principal".

As stated in the Request for Proposals and the resultant contract, "[t]he purpose of the contract is to obtain the services of a public accounting firm whose principal officers are independent certified public accountants. The offeror must be certified or licensed by a regulatory authority of a State or other political subdivision of the United States." In Article III of contract 148, the following appears:

Information contained in the Offeror's proposal regarding the organization, supervisors and audit teams that are to be utilized in the performance of the audits under this contract is hereby incorporated into this contract. Any changes in these arrangements are to be submitted to the Contracting Officer's Technical Representative for approval. If the Offeror fails to utilize the approved organization, supervisors and audit teams, the Department may, by written notice of the default to the Offeror, terminate the whole or any part of this contract in accordance with Clause 11 of the General Provisions, entitled "Default".

This was the first time the DOL had included terms in a contract for audit services which would enable it to maintain control of the contractor's staffing. The provision was introduced because the agency had previously experienced problems with accounting firms which furnished high quality resumes with their proposals and then used less qualified and inexperienced auditors to perform the actual work on the contract. The DOL felt that this practice resulted in a work product which was inferior to that which it could have otherwise expected from the proposal.

The Best and Final Proposal submitted by Opalack designated LiPera as project manager and an organization of four audit teams, of three people each, serving designated geographical areas. The following statement accompanied and explained the staffing plan submitted:

CONTINUITY AND COMPOSITION OF AUDIT TEAMS

To ensure the delivery of the level of effort presented in the previous section, the appropriate staffing must be marshalled in advance. To demonstrate our planning in this area, we have prepared for your review, a more detailed description of the precise staffing plan we will use in the performance of the engagement. This plan is shown as Exhibit II, which follows this page.

Each member of the audit teams is dedicated fulltime to the performance of this contract. The schedules have been amended so that members are completely available for Migrant audits for the period 1 February through 1 August 1978. Additionally, each audit team has been designated a limited geographical area in which to conduct Migrant Program audits. Each audit team is responsible for the successful completion of the audits within its designated area. The audit teams, their designated geographical areas, and corresponding auditees are depicted on Exhibit III.

The organizational plan expressly depicted in Exhibit III set up four audit teams, each assigned to a specific geographical region so as to assure consistently high quality audits. Moreover, according to the plan, each auditor was assigned full time to the performance of contract 148. The plan was approved by the DOL, thus becoming part of Opalack's contractual obligation, as provided in Article III of the contract above quoted. By proposed amendment of January 20, 1978, approved by the contracting officer's technical representative, four

audit teams were established, consisting of five specified individuals on each team for Washington and Chicago and four specified individuals on each team for Dallas and San Francisco. A senior auditor on each team was designated as a team leader.

In the latter part of February and early in March 1978, the DOL's Directorate of Audit and Investigations (DA & I) undertook to monitor three audits then being performed by Opalack. No team leader was present at any of the three sites, nor was there a full complement of auditors as required under the amended organizational plan. A senior auditor was present at only one of the sites. Of the total of five auditors working on all three sites, only one was working in his designated area.

At the end of March 1978, in the course of Opalack's audit of Associated City Council Economic Development Corporation in Edinburg, Texas, the senior auditor on the site represented that the audit then in progress was routine, with no major problems or questioned costs, despite the fact that the Employment and Training Administration was about to cease funding the organization because of gross mismanagement and the FBI was then investigating the agency for fraud. Under date of April 4, 1978, the Chief of the Division of Procurement in the DOL notified Opalack in a formal "Cure Letter" that it was not providing qualified personnel teamed up as set forth in the proposal and contract and that the firm might have partners who are not independent CPAs. It was stated that this would be a direct breach of Article III of the contract, as a result of which the contractor's performance was in default. Opalack was given ten days to cure the default or to present reasons why the contract should not be terminated for default. The responses presented at a subsequent meeting were found to be unacceptable,[6] and a notice of termination of contract 148 for default on the grounds above stated was issued on April 27, 1978.

At or about that time, the DA & I was also checking into the audits that had been performed by the contractor on its contract 191, and it engaged Metcalf, Frix and Co., an accounting firm in Atlanta, Georgia, to review and report on the audit work papers which had been prepared under that contract. Early in August 1978, Metcalf reported to the DA & I that out of 210 of Opalack's audits that they had reviewed, they had found what they described as deficiencies in 159. All but 12 of these alleged deficiencies were of two types. Audit procedures were not adequately performed and/or documented. Audit work papers did not contain sufficient evidence to support opinions and conclusions reached in either the work papers or the related audit reports.

ALJ Feldman found that the vast majority of these defects were of a clerical or technical nature and were of little consequence. For example, there would be a departure from prescribed procedures by failure to include a copy of the notice to the agency of when the audit was to begin, or a failure to make a proper notation of an exit interview.

In the other 12, Metcalf reported that deficiencies existed in one or more of the following categories. Evidence of noncompliance with federal regulations was either not investigated or not reported. Information contained in audit reports was sometimes inconsistent with the underlying audit work papers, and information in audit work papers did not agree with related details and invoice billings. With respect to these, the DOL Board of Contract Appeals found that purported errors and omissions were of a more serious nature, but none of them was of sufficient magnitude to warrant an inference of willful misconduct, gross neglect or professional incompetence.

ALJ Feldman concluded as follows: "Nevertheless, though the motivation for the review might be suspect, all the evidence adduced with respect to the Contrac-

---

6. Opalack agreed to restrict auditors to their assigned geographical regions but would not agree to provide full audit teams for each audit. Tr. 12 (1981 Transcript).

tor's work-papers on Contract 0191 demonstrate[s] clearly that its performance was considerably less than perfect."

Around November 1978, Opalack complained to the DOL that it was being "blacklisted" with respect to new contracts and was thus being informally suspended. Based on the results of the Metcalf review of the audit work papers under contract 191, and the reasons for the default termination of contract 148,[7] the DOL officially notified the contractor on January 4, 1979 of its intention to debar the firm and all persons who were its partners or principal officers from September 24, 1975 to date from participation in contracting or subcontracting with the DOL (department-wide) for a period of three years. The letter also contained a notice of immediate suspension.[8]

### The Two Administrative Decisions

As earlier outlined, the first decision was the one which intermingled the issues of debarment and termination for default. The first argument addressed therein by ALJ Feldman (the BCA) was whether the termination for default and the three-year debarment were justified "because partners of [Opalack & Co.] may not be certified public accountants, as required by Article II, Objective of Contract Schedule."[9] That article further provides that the firm must be certified or licensed by a regulatory authority of a State or other political subdivision of the United States. LiPera and Cotton were not CPAs. The DOL therefore maintained that this justified

both the termination for default and the debarment.

The ALJ (Board) rejected this argument because Article II "speaks of accounting firms in corporate terms." His "Decision and Order" notes that normally accountants practice individually, or in partnerships, and that normally partnerships do not have officers, such as president, vice president, secretaries, or treasurers. He therefore holds that since the agreement does not define the persons to be included in the category of "principal officers of a partnership", a breach of contract cannot be founded upon proof that two of four partners were not CPAs. It is further held that nothing in the language employed can be reasonably construed to mean that *all* of the members of the firm must be CPAs.

The first "Decision and Order" also rules that the requirement for licensing by a regulatory authority cannot reasonably be construed to require some license or permit other than, or in addition to, CPA status.[10] It was concluded that the DOL did not show that there was any misrepresentation or deception regarding the identity or professional status of the partners of Opalack.

Turning to what is regarded as a more serious issue, namely, failure of Opalack to provide audit personnel teamed up as required, and the deficiencies in the working papers as earlier described, the "Decision and Order" holds as follows:

> With respect to debarment and termination for default because of failure to provide qualified personnel teamed up as

---

7. Namely, failure to provide qualified personnel teamed up as set forth in the proposal, and doubts that all the partners were CPAs.

8. As mentioned earlier in the introductory portion of this opinion, the suspension was terminated ten weeks later, following the first hearing on the debarment issue. ALJ Feldman terminated the suspension for three stated reasons. He found that the DOL failed to follow its own rules and regulations when it suspended plaintiffs. He concluded that there was inadequate evidence presented to suspend plaintiffs because of suspected criminal or fraudulent activity. It was further concluded that plaintiffs' failure to perform, or to perform satisfactorily, did not

constitute a reason of such serious and compelling nature, affecting Opalack's responsibility as a Government contractor, as to warrant suspension within the meaning of 41 C.F.R. § 1–1.605–1(a)(2).

9. Article II requires "the services of a public accounting firm whose *principal officers* are independent certified public accountant" [sic]. (Emphasis supplied.)

10. Opalack, although headquartered in the District of Columbia during at least part of the time it was performing these Government contracts, was not licensed to do business within the District.

set forth in the proposal as amended, there is some room for conflicting interpretations of the intention of the parties in regard to the rigidity with which the team concept should be applied. It appears from the evidence as to assignment of auditors to various jobs that the Contractor took the position that once the members of the teams had been approved, they were entirely fungible and could be freely interchanged without regard to team organization or geographical distribution. Though it was rarely necessary for all the members of a team to be on site at the same time, the specification of the four teams in the project organization and the requirement for departmental approval of any changes therein make it clear that it was intended that DA & I retain some degree of control over the selection and qualification of the personnel to work on each audit. Consequently, I conclude that the Government has established by a fair preponderance of the evidence that the Contractor failed in some degree to perform the obligations of the contract with respect to the provisions for audit teams. *I further conclude that such failure constitutes a material breach of Contract 0148, which expressly authorizes termination therefor.* Whether of itself it constitutes a violation of contract provisions of a character so serious as to justify debarment as a willful failure to perform in accordance with the specifications pursuant to 41 CFR § 1–1.-604(a)(4)(i) need not be determined. As shown below, it is enough that it constitutes in part a record of unsatisfactory performance in accordance with subparagraph (ii) of that regulation. [Emphasis supplied.]

Though it is true that many of the deficiencies in the Contractor's work-papers on Contract 0191 as charged by the Metcalf firm were inconsequential, and a number of them were accountable as *bona fide* differences in professional judgment, the evidence overall shows what might be fairly regarded as unsatisfactory performance. The audits under Contract 0191 having been performed throughout the year 1977, and the above-described breach of Contract 0148 having occurred in 1978, the Department determined to debar the Contractor within a reasonable time. From all the evidence of the Contractor's performance of both contracts, I conclude that the Government has established by clear and convincing evidence a record of unsatisfactory performance by the Contractor in accordance with the terms of Contracts 0191 and 0148; and further that such violation is of a character which is regarded by the Department to be so serious as to justify debarment action pursuant to 41 CFR § 1–1.604(a)(4)(ii).

The second administrative decision earlier described is captioned:

In the Matter of
TERMINATION OF CONTRACT 0148

It is entitled "Decision on Reconsideration", is printed on letterhead of the U.S. Department of Labor, Office of Administrative Law Judges, but it also bears a "BCA" docket number. The very brief decision is signed by Robert J. Feldman, "Panel Chairman", and Robert L. Ramsey, "Panel Member".[11] The decision holds:

\* \* \* Utilization of those specific teams was deemed, by virtue of \* \* \* [Article III], to be of the essence of the contract.

\* \* \* \* \* \*

\* \* \* Whether the variation from the approved groups was of major proportions is of little concern. The fact is that the provision \* \* \* makes any failure to utilize the approved audit teams a material breach, expressly entitling the Department to terminate for default.

Appellants have not shown on the reopening that there was any error or infirmity in the original decision. The affirmance of the termination of Contract No. J–9–D–7–0148 for default of the Contractor is therefore confirmed.

---

**11.** As was the second "signing" page of the first    decision.

Plaintiffs' brief notes that payment has not been received for 50 reports and invoices which were submitted under contract 191. Although more than 250 invoices were received and accepted by the DOL, and invoices totaling approximately $275,000 were paid by the Department after February 21, 1978, these remaining 50 reports and invoices have been held by DOL officers and have not been referred to the contracting officer for payment.

This withholding, it is assumed, is related to defendant's counterclaim in the amount of $942,686.30, which is set forth in a decision of the contracting officer dated March 2, 1982 and incorporated in an amended Answer herein filed March 11, 1982.

## Discussion

### The Due Process Issue

The administrative procedural history of this contract dispute leaves much to be desired, and that is the basis of a contention that the contractor has been denied fundamental procedural due process in the default termination of contract 148.

■■■ When the DOL determined that the first hearing above described would be a full, trial-type hearing, procedural due process required an adequate notice of that hearing and an opportunity to be heard on the issues defined in that notice. The notice referred to the debarment. Moreover, at the outset of the hearing, the ALJ specifically limited its scope to the debarment and expressly excluded the default issues except to the extent that they were collat-

eral to debarment. Plaintiffs' rights were therefore abridged by the issuance of a decision purporting to treat conclusively with the default termination, particularly since that required a prior contracting officer's decision, followed by a quite different procedural path to the Department's designated Board of Contract Appeals.[12]

■■ However, deficiencies in administrative procedures can be cured,[13] and they were thereafter cured in this case when the two signatories sitting as a Board of Contract Appeals reopened and reconsidered the first decision, took some additional evidence, and reiterated their decision on the default issue after incorporating the evidence that had been taken on that issue in the course of the first hearing on debarment. The action taken by a court to correct the due process deficiencies above described would normally be to direct just about the same action which has already been taken by the agency to cure those deficiencies. The due process issue is therefore moot.[14]

### The Default Termination

■■ As explained in the introduction, the default termination arises under the "Disputes" clause in the contract, and it is to be reviewed under the standards set forth in the Wunderlich Act.[15] Section 2 of the Act[16] prohibits a Government contract "provision making final on a question of law the decision of any administrative * * board."[17] An examination of the two administrative decisions herein discloses that the operative facts were not seriously in

12. In contrast, the debarment was to be heard by a single designated representative of the Secretary of Labor and under different regulatory standards. Inexplicably, the first decision, on debarment, is on letterhead of the Board of Contract Appeals; and the second, on the contract dispute over the default termination, is on the letterhead of the Office of Administrative Law Judges.

13. See, for example, Schwartz, *Administrative Law*, 274–77 (1976).

14. Plaintiffs also complain that the intermingling of the two determinations on debarment and default influenced the standards applied to

*debar* the contractor, because a lesser test is presumably applied to a default termination. But this is not a due process issue so much as it is an attack on the debarment decision. As later explained, that is not a matter on which this court has jurisdiction.

15. See note 4, *supra.*

16. *Id.,* 41 U.S.C. § 322.

17. See, for example, *Foster Wheeler Corp. v. United States,* 206 Ct.Cl. 533, 544, 513 F.2d 588, 593 (1975), a case involving a conclusion of mixed fact and law.

dispute and that the decisions are based almost entirely on an interpretation of contract 148, as amended. Interpretation of a contract involves a decision on a question of law, and it therefore can be addressed by the court *de novo*.[18]

Article III of the contract specifically incorporated the contractor's staffing proposal into contract 148. Any changes thereafter required specific approval of the contracting officer's technical representative. The contractor's proposal described a "team" concept under which each audit was to be performed by a specific group assigned to the relevant geographical region. This approach was possible because the contractor had further proposed that "(e)ach member of the audit teams is dedicated full-time to the performance of this contract." Furthermore, the contractor had proposed a formal amendment to modify its staffing plans after submission of its Best and Final Proposal. The amendment, also approved by the contracting officer's technical representative, called for the establishment of four audit teams, consisting of a specified number of individuals on each team, assigned to a specific region. Plaintiffs in effect now assert that the contract did not contemplate the team concept described in their own proposal.

■■■ Ordinarily, when interpreting a contract, the plain meaning of the contract is binding upon the court unless the contract by its very terms is inherently ambiguous.[19] A contract is ambiguous if it is subject to more than one reasonable interpretation.[20] But it is not appropriate to strain the language of the contract to create an ambiguity.[21]

■ The very terms of Article III unambiguously incorporated all approved staffing proposals into the contract and simultaneously made them material to the contract. The above-quoted Article III and the above-quoted portion of the contractor's Best and Final Proposal are susceptible to only one reasonable interpretation. Opalack was obligated to provide the exact audit teams it proposed and to provide them in their assigned geographical regions. If the contractor could not meet that obligation for any reason, Article III of the contract required it to obtain approval for any change from the contracting officer's technical representative. There was a perfectly adequate mechanism to make staffing adjustments, and the contractor failed to adhere to those procedures.

In short, the court reaches the same interpretation of the contract requirements as was reached in the two administrative decisions above outlined. That the contractor did not in fact perform in accordance with material contract requirements is virtually undisputed, and to the extent that it is disputed, the findings of fact thereon are supported by substantial evidence in the record.[22] The contract requirements violated were in fact material, as also shown in the record. There was good reason for the imposition of strict staffing controls on this contract. The DOL had discovered numerous deficiencies on prior CETA audits.[23] The inadequacies occurred because contractors would bid on contracts, using the resumes of highly qualified auditors, only to substitute less qualified and less experienced auditors during actual performance.[24] In this case, the contract terms

18. See *Bishop Engineering Co. v. United States*, 180 Ct.Cl. 411 (1967).

19. ' See and *cf. S.W. Aircraft, Inc. v. United States*, 213 Ct.Cl. 206, 212, 551 F.2d 1208, 1212 (1977).

20. *Id.*

21. *Bishop Engineering Co. v. United States*, note 18, *supra*, 180 Ct.Cl. at 415–16.

22. Note 4, *supra*, 41 U.S.C. § 321.

23. Similar deficiencies had been uncovered with respect to companion contract 191.

24. Defendant filed a motion to reopen the hearing before the Board in order to present evidence of a plea of guilty by Paul Opalack to two counts of "false pretenses" in connection with contract 191. The motion was denied by the Board and the proffered evidence was excluded. There are references to this in the briefs of the parties. Those references and related docu-

were largely shaped by the contractor's own proposal. In the circumstances, failure to adhere to those terms can hardly be disregarded.

Plaintiffs also argue that the DOL's requests that certain audits be given priority interfered with the contractor's ability to perform the contract in accordance with its terms, and this amounted to a constructive change in those terms. But the fact that the DOL requested certain audits to be performed earlier than scheduled did not abrogate the contractor's obligation to obtain prior approval of all staffing changes. Under the terms of the contract, Opalack could not unilaterally decide what level of staffing it deemed adequate. If plaintiffs could not provide the full team or the specific team for the appropriate region, they should have first sought approval from the contracting officer's technical representative. Only in this way could the DOL have been assured that each audit was being performed by a qualified team. The contractor was in default on the contract, and the termination for default was proper.

### The Debarment

Plaintiffs also seek review of the intermingled decision to debar them from contracting with the DOL. The jurisdiction of the Claims Court under the Tucker Act (28 U.S.C. § 1491(a)(1)) is limited to claims in which a plaintiff seeks money damages.[25]

The debarment issue is one that would normally be reviewed by a United States District Court under the Administrative Procedure Act. This court can grant such equitable relief only when it is "tied and subordinate to a monetary award."[26]

Nor is it clear that the provisions authorizing equitable relief in 28 U.S.C. § 1491(a)(2)[27] are even applicable to a plea for the lifting of a debarment. In any event, the debarment was based on overall unsatisfactory performance of contract 191 and the breach of contract 148, which has been terminated for default. Having concluded that the contractor was in default on contract 148, there is no money judgment to which affirmative non-monetary relief can be "tied". This court is without jurisdiction to review the debarment.

### The Counterclaim

At the conclusion of the "Statement of Facts" above, it was observed that some 50 reports and invoices of the contractor under contract 191 have been held and not paid. The complaint herein does not seek to recover a monetary judgment for these unpaid invoices, nor was this non-payment an issue before the Board when it rendered the decisions herein reviewed. The withholding as an apparent offset is probably related to a counterclaim in the amount of $942,686.30, which was not the subject of a contracting officer's decision until later on March 2, 1982. It was thereafter pleaded in an amended Answer on March 11, 1982.

Unlike plaintiffs' action herein, which has been treated as a review of prior Board decisions measured against the Wunderlich Act standards,[28] the counterclaim was pending before the contracting officer after the effective date of the Contract Disputes Act and falls under that Act. For a very similar case, see *Tester Corp. v. United*

---

ments are not, however, deemed part of the record being reviewed herein.

**25.** *See Austin v. United States,* 206 Ct.Cl. 719, 723, *cert. denied,* 423 U.S. 911, 96 S.Ct. 215, 46 L.Ed.2d 140 (1975).

**26.** *Id.*

**27.** "(a)(2) To provide an entire remedy and to complete the relief afforded by the judgment, the court may, as an incident of and collateral

to any such judgment, issue orders directing restoration to office or position, placement in appropriate duty or retirement status, and correction of applicable records, and such orders may be issued to any appropriate official of the United States. In any case within its jurisdiction, the court shall have the power to remand appropriate matters to any administrative or executive body or official with such direction as it may deem proper and just. * * *"

**28.** *See* notes 1–4, *supra.*

*States.*[29] In addition to requiring a contracting officer's decision on the counterclaim, the Contract Disputes Act affords a contractor aggrieved by that decision several alternatives. It can take no action with respect to the decision, whereupon it becomes final.[30] In the alternative, it can appeal to the agency's board of contract appeals.[31] In the further alternative, the contractor can file an action in this court.[32]

The record is silent on what action plaintiffs took following issuance of the contracting officer's later decision on the counterclaim on March 2, 1982. Plaintiffs' present action in this court does not mention it because this action seeks review of two other administrative decisions, and suit was filed prior to the contracting officer's decision on the counterclaim. While a copy of the contracting officer's decision was appended to defendant's cross-motion for summary judgment herein, there is no evidence of an appeal to the DOL Board of Contract Appeals, as invited therein.[33]

The foregoing considered, defendant's motion as it relates to the counterclaim cannot presently be considered. Because of the different procedures which would be followed if an appeal has been taken to the Board, the more appropriate procedure is to dismiss defendant's counterclaim without prejudice at this time.[34]

### Conclusion

Plaintiffs' Motion for Summary Judgment as it relates to the default termination is *Denied;* and as it relates to the debarment, it is dismissed without prejudice. Defendant's Cross-Motion for Summary Judgment as it relates to the default termination is *Allowed,* except with respect to its counterclaim, which is denied without

prejudice. The petition is to be dismissed upon completion of any further proceedings which may be required on the counterclaim. Counsel are directed to advise within 30 days whether or not the contracting officer's claim for excess costs was appealed, in order that it may be determined whether further proceedings in this court are required.

**29.** 227 Ct.Cl. 648 (1981).

**30.** 41 U.S.C. § 605(b).

**31.** 41 U.S.C. § 606.

**32.** 41 U.S.C. § 609(a). But *see* and *cf. Joseph Morton Co. v. United States,* 3 Cl.Ct. 120 and 780 (1983), which rejects the holding in *Woods Hole Oceanographic Institute v. United States,* 677 F.2d 149, 156 (1st Cir.1982), to the effect that 41

U.S.C. § 609(a) is "limited to claims of the contractor, not of the government."

**33.** This does not preclude the possibility that an appeal was taken to the Board. If it was, and the Board's decision is adverse, review would be by the Court of Appeals for the Federal Circuit, not this court. *See* note 3, *supra.*

**34.** *Cf. Zidell Explorations, Inc. v. United States,* 192 Ct.Cl. 331, 427 F.2d 735 (1970).