**SHEARSON LEHMAN HUTTON, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 487–89C.

United States Claims Court.

Dec. 20, 1991.

Perry M. Rosen, Washington, D.C., for plaintiff.

Steven J. Gillingham, Washington, D.C., with whom was Asst. Atty. Gen. Stuart M. Gerson, for defendant.

### ORDER

MOODY R. TIDWELL, III, Judge:

This case is before the court on the parties' cross-motions for summary judgment

pursuant to RUSCC 56. For the reasons set forth below, the court grants defendant's motion and denies plaintiff's cross-motion.

## FACTS

In July 1986, the Department of Energy (DOE) took title to the Great Plains Coal Gasification Plant (Plant), located near Beulah, North Dakota. The Plant had been built by the Great Plains Gasification Associates (GPGA)[1] between 1981 and 1984, and is the only large-scale, commercial facility in the United States designed to produce pipeline-quality synthetic natural gas (SNG) from coal. Because of the technical and economic risks involved in building the facility, DOE agreed to provide financial assistance to the GPGA in the form of a $2.02 billion loan guarantee, made under the authority of the Federal Nonnuclear Energy Research and Development Act of 1974, 42 U.S.C. §§ 5901–20 (1988).[2] Although the Plant was completed under budget and ahead of schedule, it was not an economic success. The decline of energy prices, after their peak in the early 1980's, forced the GPGA to seek a restructuring of the DOE-guaranteed loan. DOE rejected the restructuring proposal and determined that additional financial assistance would prove too costly for taxpayers. On August 1, 1985, the GPGA defaulted on the $2.02 billion loan and the DOE took possession of the facility. The DOE later paid the Plant's outstanding loan balance and took title through foreclosure.

Shortly after it undertook management of the Plant, DOE decided to privatize the facility with the help of an investment banker. On May 20, 1986, Request For Proposals No. DE–RP01–86FE61054 (RFP I) was issued to solicit the necessary services. Before completion of the first solicitation phase, RFP I was replaced with an expanded solicitation, RFP No. DE–RP01–87FE61083 (RFP II), which was structured to maximize the value of the sale to the government over time. Offerors responding to RFP II were required to submit their offers in the form of a fee based on a percentage of the proceeds that defendant would receive for the sale. DOE set up a collection of documents in DOE reading rooms to assist prospective offerors in determining the value of "the Plant and its assets." Shearson Lehman Hutton, Inc. (Shearson) submitted the successful proposal and was awarded the contract on February 26, 1987.

Defendant agreed to pay Shearson quarterly payments of $100,000, "not to exceed six quarters," to support the sales effort until a sale was consummated. If, in fact, a sale occurred, the quarterly payments would be credited against a contingent fee, calculated as follows:

> The Contractor shall receive a Contingent Fee equal to the percent identified below of the Aggregate Consideration* received in connection with such sale (hereinafter "Contingent Fee").
>
> . . . .
>
> $$1\% \text{ on the first } \$50 \text{ million}$$
> $$\tfrac{1}{2}\% \text{ on the next } \$450 \text{ million}$$
> CONTINGENT FEE: ⅜% over $500 million     of Aggregate Consideration*
> *Aggregate Consideration is defined as the net present value of the sale proceeds payable to the government, based upon discounting at a rate of 10% to the date of ownership transfer.

1. The GPGA was a partnership of "four major interstate natural gas pipelines and one major utility."

2. Plaintiff, in its motion and its Proposed Findings of Uncontroverted Facts, listed the loan guarantee at $1.2 billion, while defendant calculated it at $2.02 billion. This discrepancy did not involve a material fact and, therefore, was not a factor in the court's decision.

The contract also provided that aggregate consideration would be adjusted if "unconventional financing instruments which [did] not have specific and certain payments" were used. Instead of being discounted at 10 percent, such instruments would be discounted at a rate to be determined by the government, to appropriately reflect the government's risk.

Shearson immediately began to market the Plant, emphasizing the availability of the Plant's Production Tax Credit (PTC) and cash reserves. Seventeen potential purchasers responded, nine of which submitted formal proposals. Over time the number of acceptable bidders was reduced to three: Coastal Corporation, Mission First Financial, and Basin Electric Power Cooperative (Basin). In June 1988, DOE began to deal exclusively with the three offerors and Shearson had no further involvement with the sale. On October 7, 1988, defendant agreed to sell the Plant to Basin under the terms contained in the Asset Purchase Agreement (APA). Section 2.3 of the APA detailed the consideration for the sale as follows:

> (a) Purchaser shall, at the Closing, deliver to Seller, in immediately available funds, the sum of $15,136,000 for the SNG Pipeline;

> (b) DCC shall, at the Closing, deliver to Seller, in immediately available funds, the sum of $69,864,000 for the Mining Assets; [3]

> (c) Purchaser shall pay up to $1.2565 billion of Revenue Sharing Payments in accordance with § 3.1 hereof for the Purchased Project Assets other than the SNG Pipeline;

> (d) Purchasers shall, at the Closing, execute and deliver the Great Plains Project Trust, thereby giving Seller the right to receive at the time provided in such Trust, among other things, the bal-ance of the $75,000,000 placed on deposit in the Reserve Trust Account of such Trust at the Closing pursuant to § 11.2 hereof, plus all interest to be accrued thereon; [4]

> (e) Each of the Purchasers, Basin Electric and DCC shall, by written agreement in form and substance satisfactory to Seller delivered to Seller at closing, on behalf of itself, its successors and assigns, and any affiliated group of corporations with which Purchaser, Basin or DCC files consolidated federal income tax returns, (i) irrevocably and unconditionally waive any and all rights which any of purchaser, DCC, Basin Electric, their successors or assigns, or any affiliated group, may have to claim any credit with respect to federal income taxes pursuant to § 29 of the Internal Revenue Code of 1986, as amended....

For its services, Shearson received $1,207,500.[5] Defendant based Shearson's fee on the $85 million in cash it received at closing and the net present value (NPV) of the future revenue sharing payments, which was calculated to be $106.5 million. DOE determined that the future revenue sharing payments were "unconventional financing," and discounted them at 12.5 percent. Shearson disagreed with the DOE's calculation of its fee and, on March 13, 1989, filed a certified claim for additional fees based on: (1) the NPV of Basin's PTC waiver; (2) defendant's establishment of the $105 million Project Trust; (3) defendant's retention of $17,846,000 in cash from the assets of the Plant; and (4) the NPV of the future revenue sharing payments discounted at the standard rate of 10 percent rather than the 12.5 percent used for "unconventional financing."

The contracting officer denied Shearson's claim and Shearson filed a timely complaint

---

3. Dakota Coal Company (DCC) is a subsidiary of Basin.

4. The Project Trust consisted of two accounts: a $30 million Environmental Account and a $75 million Reserve Account.

5. Shearson was paid $600,000 during the marketing phase and $607,500 after the sale was consummated.

with this court requesting an adjustment of its fee as outlined above, plus statutory interest on the unpaid balance. Both parties moved for summary judgment, claiming that no genuine issues of material fact existed.

## DISCUSSION

Summary judgment is appropriate when "there is no genuine issue as to any material fact" so that the moving party "is entitled to judgment as a matter of law." RUSCC 56(c) (1991). In evaluating a motion for summary judgment, any doubt as to whether a genuine issue of material fact exists must be resolved in favor of the non-moving party. *Adickes v. Kress & Co.*, 398 U.S. 144, 158–59, 90 S.Ct. 1598, 1609, 26 L.Ed.2d 142 (1970); *Campbell v. United States*, 2 Cl.Ct. 247, 249 (1983). When the moving party has carried its burden, the non-moving party must come forward with specific facts showing that a genuine issue for trial exists, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986), and may not discharge its burden by cryptic, conclusory, or generalized responses. *See Willetts v. Ford Motor Co.*, 583 F.2d 852, 856 (6th Cir.1978); *Tunnell v. Wiley*, 514 F.2d 971, 976 (3d Cir. 1975). "[When] the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Id.* 475 U.S. at 587, 106 S.Ct. at 1356 (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289, 88 S.Ct. 1575, 1593, 20 L.Ed.2d 569 (1968)). A genuine issue of material fact is one that would change the outcome of the litigation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986); *Chevron U.S.A., et al. v. United States*, 17 Cl.Ct. 537, 540 (1989), *rev'd on other grounds*, 923 F.2d 830 (Fed.Cir.1991).

The court agrees that no material facts are in dispute. The issues in this case are solely matters of contract interpretation, and are consequently appropriate subjects for summary judgment. *Government Sys. Advisors, Inc. v. United States*, 847 F.2d 811, 812 & n. 1 (Fed.Cir.1988); *Ralph Larsen & Son, Inc. v. United States*, 17 Cl.Ct. 39, 46 (1989); *Industrial Indem. Co. v. United States*, 14 Cl.Ct. 351, 356 (1988).

### A. Basin's Waiver of the Production Tax Credit Was Properly Excluded From Aggregate Consideration.

■ Shearson argued that Basin's waiver of the PTC should have been included in aggregate consideration since the United States Treasury would not incur the loss of approximately $590 million in tax receipts over a period of years. Defendant maintained that the PTC waiver did not constitute "proceeds payable" and, therefore, could not be included in the aggregate consideration. Before the court can decide which view of aggregate consideration is correct, it must initially determine whether the contract is ambiguous. *See Enrico Roman, Inc. v. United States*, 2 Cl.Ct. 104, 106 (1983). The issue of ambiguity is "a question of law for the court to decide." *John C. Grimberg Co.* 7 Cl.Ct. 452, 456 (1985). The fact that the parties disagree as to the meaning of a contract provision does not necessarily render that provision ambiguous. *Perry and Wallis, Inc. v. United States*, 192 Ct.Cl. 310, 427 F.2d 722, 725 (1970); *Southern Construction Co., Inc. v. United States*, 176 Ct.Cl. 1339, 364 F.2d 439, 453 (1966); *Cherry Hill Sand & Gravel Co. v. United States*, 8 Cl.Ct. 757, 764 (1985). A provision of a contract is ambiguous only if it is susceptible to "more than one reasonable interpretation." *Opalack v. United States*, 5 Cl.Ct. 349, 359 (1984). *See S.W. Aircraft, Inc. v. United States*, 213 Ct.Cl. 206, 551 F.2d 1208, 1212 (1977).

■ The contract in this case removes any possibility of ambiguity in the term aggregate consideration by defining it as the "net present value of the sale proceeds payable to the Government." No reasonable uncertainty exists as to this definition and the court must conclude that the con-

tract is not ambiguous. *See Southern Constr. Co.*, 364 F.2d at 453. Shearson's different interpretation of "proceeds payable" and of involuntary acquiescence to the contract are not reasonable and need not be addressed further. Neither can Shearson be heard to argue industry practices to support its preferred interpretation of the contract. Evidence of trade meaning, usage, and custom may explain or define contract language, but will not be employed to vary or contradict the same. *Tibshraeny Bros. Constr. v. United States*, 6 Cl.Ct. 463, 470 (1984).

Since no ambiguity is inherent in the definition of aggregate consideration in the contract the plain and ordinary meaning of "proceeds payable" will be binding upon the parties. *Hol–Gar Mfg. Corp.*, 169 Ct. Cl. 384, 351 F.2d 972, 976 (1965). *See Cherry Hill*, 8 Cl.Ct. at 764; *Opalack*, 5 Cl.Ct. at 359. Although both Shearson and the DOE cited Black's Law Dictionary to argue their respective interpretations of "proceeds payable," the "context and intention [of the clause] is more meaningful than the dictionary definition." *Rice v. United States*, 192 Ct.Cl. 903, 908, 428 F.2d 1311 (1970). The plain and ordinary meaning of "proceeds payable" must be interpreted to include only the actual compensation paid for the transfer of assets from the buyer to the seller. Possible tax benefits to the treasury that arise far from the negotiating table cannot be considered "proceeds payable."

The court has no difficulty in finding that Basin's waiver of the PTC was part of the consideration for sale of the Plant. The waiver was listed as part of the "Consideration for Purchased Project Assets" in section 2.3 of the APA, and as a condition precedent to the sale in section 10.3. However, the court cannot find the waiver to be included in the "aggregate consideration" and, therefore, a factor to be used in determining Shearson's fee. In his deposition, the Chairman of the DOE's Source Evaluation Board, stated that "if someone was [*sic*] going to make a proposal to purchase the plant and utilize production tax credits, ... their payment to the government would be in the form of up-front cash for those production tax credits." In other words, Basin would have paid more for the Plant had it purchased the PTC. Because Basin did not purchase the PTC no compensation exchanged hands that would have been subject to Shearson's fee as "proceeds payable." The court cannot consider the tax consequences of the sale of the Plant a part of the aggregate consideration. Despite Shearson's numerous arguments to the contrary, the court concludes that the PTC waiver was properly excluded from aggregate consideration.

*B. The Value of the Project Trust and the $17.846 Million Retained by the DOE Were Not Aggregate Consideration.*

■ Shearson also argued that the value of the Project Trust and the $17.846 million in cash retained by defendant should have been considered as part of aggregate consideration. The Project Trust had been established by the Secretary of Energy with Norwest Bank North Dakota, N.A., as trustee.[6] It consisted of two accounts: a $30 million Environmental Account and a $75 million Reserve Account.

The Environmental Account was designed to finance plant modifications and improvements necessary to bring the facility into compliance with North Dakota sulfur emissions regulations. Basin had use of the Environmental Account but was under no obligation to repay defendant. The account was to terminate upon the occurrence of the first of the following three

---

**6.** As trustee, Norwest Bank was to hold each account separately to avoid commingling with other funds held by it, invest "all funds in the Trust Accounts ... in Eligible Investments," account for investment interest, liquidate investments, provide the Secretary of Energy and Basin with monthly statements of transactions, make appropriate loans and disbursements to Basin, and give notice to the Secretary of Energy if Basin failed to make a payment of interest or principal on any loan.

events: "(i) disbursement of $30,000,000 from the Environmental Account, (ii) receipt by the Trustee from either Dakota [Gasification Company][7] or the Secretary [of Energy] of a certificate that the [North Dakota State Department of Health] ha[d] issued an Operating Permit with respect to the Project or (iii) December 31, 1995." If any funds remained in the Environmental Account upon termination they would be distributed to the United States.

The Reserve Account was in the form of a loan from the United States to Basin to provide a source of funds for operation of the Plant. Unlike the Environmental Account, Basin was obligated to repay, from an operating surplus defined in the contract, all disbursements from the Reserve Account. Loans were to be collateralized from specified project assets. The Reserve Account was to terminate on January 1, 1999 and, thereafter, any funds received by the Trustee in payment of principal or interest on loans were to be distributed to DOE.

The Project Trust accounts and the $17.846 million were cash reserves "earned and owned by the Government prior to the sale of the Project." They were listed, respectively, under "DOE Directed Trust" and "Retained by DOE" in the financial statements prepared by Arthur Andersen & Co. that were available to all offerors in DOE reading rooms. Shearson argued that all $105 million in the Project Trust were accounts receivable to the United States over a period of years, and as such, were to be included in the calculation of it's contingent fee. The eventual, but speculative, return of funds from the Project Trust and the retained cash cannot be considered a part of aggregate consideration since the DOE was merely taking possession of its own money.[8] It is clear from the record that Basin's use of the $30 million in the Environmental Account and $75 million in the Reserve Account was included as un-

quantified consideration in the purchase price, as was consideration for other assets of the Plant purchased by Basin, and upon which Shearson has already received a fee. For Shearson to argue that it was entitled to an additional fee for the possible disbursement of residual funds to the United States from the Environmental Account and repayment under the Reserve Account is to ask for double compensation, to which it clearly is not entitled.

Shearson made much ado about the fact that defendant "never held actual possession of the funds" in the Project Trust, but the court is not persuaded that this changed the funds into proceeds payable. The Project Trust had been held in a joint bank account with DOE's operator of the Plant, American Natural Gas (ANG). Although the United States had no employees or representatives with signature authority on the account, defendant pointed out that "all actions taken by ANG ... [were] subject to the exclusive direction and control of the Secretary [of DOE]." By keeping the Project Trust funds in the joint account, defendant could "maintain [the] books and records of the facility consistent with that of a commercial operation" and make sale of the Plant more feasible. Furthermore, the contract specifically excluded all cash from assets sold, except for $15 million set forth in Schedule 1.1C of the APA, and not in dispute here. The government, as owner of all the Plant's assets, simply decided not to sell all of them. Clearly, use of the Project Trust funds, and the $17.846 million retained by defendant, cannot be considered aggregate consideration.

### C. The Discount Rate Applicable To Future Revenue Sharing Is 12.5 Percent.

■ Shearson's final argument required the court to determine whether the contract provision governing unconventional financing instruments was ambiguous.

7. Dakota Gasification Company is another subsidiary of Basin.

8. The court doubts seriously whether any Environmental Account funds will be disbursed to the United States. Shearson pointed out that DOE officials had assured the congress and the

public that some funds would be returned from the Environmental Account but statements later in time, in defendant's brief, were that it did not expect for that account to have any residual funds to be disbursed to the treasury.

"[T]he provisions of a contract must be construed to effectuate the spirit and purpose of a contract." *Tibshraeny*, 6 Cl.Ct. at 468. A contract is ambiguous "if it is susceptible of two different interpretations, each of which if found to be consistent with the contract's language." *Monarch Painting Corp. v. United States*, 16 Cl.Ct. 280, 286 (1989). The disputed clause is as follows:

In the event that a portion of the Government's consideration is to be in the form of unconventional financing instruments which do not have specific and certain payments to the Government, the Aggregate Consideration shall be adjusted to reflect the net present value at the time of ownership transfer of such instruments, using a discount rate, as determined by the Government, which appropriately reflects the Government's risk.

Shearson argued that the clause, in effect, should be read with a comma between the phrase "unconventional financing instruments" and the phrase "which do not have specific and certain payments to the Government." If that were the case, the provision could be interpreted two ways: (1) that *all* financing instruments without specific and certain payments were unconventional and would be discounted at defendant's discretion, or (2) that *only* unconventional financing instruments which do not have specific and certain payments would be so discounted. Shearson argued that the latter interpretation was controlling and that Basin's revenue-sharing payment arrangement constituted conventional financing that, incidentally, did not have specific and certain payments. In support of its argument, Shearson cited a statement of its expert witness that revenue sharing was "fairly common." Shearson continued, that since the clause dealt only with unconventional financing, Basin's conventional financing revenue-sharing payments should have been discounted at the standard rate of 10 percent. In the opinion of the court, Shearson's proposed interpretation ignored the purpose of the clause and cannot be considered reasonable.

Defendant included the provision to ensure that it could properly account for the increased risk of accepting financing schemes without specific and certain payments. It is a historically known fact that the Plant's revenues vary from year to year. No guarantee exists that oil and gas prices will remain stable or increase in the coming years. Indeed, the probability even exists that gas prices may decline, leaving the government without any revenue sharing payments. That is the very nature of the risk in revenue-sharing agreements. Assistant Secretary of the DOE, J. Allen Wampler, emphasized this point when he testified before the Senate Committee on Energy and Natural Resources that "the actual value of the agreement will vary with inflation and gas prices." Shearson disregarded these factors, and its interpretation would render this section of the contract meaningless. Pursuant to its duty to harmonize all contractual provisions, *United Pac. Ins. Co. v. United States*, 204 Ct.Cl. 686, 938, 497 F.2d 1402, 1405 (1974), and to reject interpretations that leave portions of a contract meaningless, *Monarch*, 16 Cl.Ct. at 287, the court adopts defendant's interpretation as the only reasonable one. *See Perry and Wallis*, 427 F.2d at 725–26.

Although Shearson devoted much of its cross-motion to arguing the law of *contra proferentem*, that principle applies only "when a contractor's reading of an ambiguous contract provision is reasonable in itself." *United States v. Turner Constr. Co.*, 819 F.2d 283, 286 (Fed.Cir.1987). In light of the circumstances, Shearson's arguments that the contract be construed against defendant were not reasonable and must fail. *See Perry and Wallis*, 427 F.2d at 725–26.

The court affirms that the future revenue sharing payments were properly discounted at 12.5 percent. Shearson contended that the 12.5 percent discount rate was inappropriate since the government had already calculated the uncertainty of the revenue-sharing payments into its cash-flow estimates. With the uncertainty of the payments already taken into consideration the contract rate of 10 percent should have been used. However, after finding that

the revenue-sharing agreement was "conventional," within the context of the Asset Purchase Agreement contract, the court concludes that defendant properly could have selected a discount rate that best represented its risk. The court considers 12.5 percent a reasonable rate under the circumstances.

### CONCLUSION

The value of the Production Tax Credit, the Great Plains Project Trust, and the $17.846 million in cash were a part of the overall consideration for the Asset Purchase Agreement contract paid by Basin, but none were proceeds payable within the definition of "aggregate consideration," and therefore, properly not included in the calculation of Shearson's fee. Furthermore, defendant properly discounted the future revenue sharing payments from Basin at 12.5 percent. The payments came within the ambit of the unconventional financing instruments clause. Defendant's interpretation, in light of the circumstances, was the only reasonable interpretation.

Following a careful examination of each parties' motion, and giving the proper presumptions and preferences required by the law of summary judgment, the court finds that neither party has presented genuine issues of material fact to be tried and that Shearson is not entitled to an increase in its contingent fee. Therefore, the court denies Shearson's cross-motion for summary judgment and grants defendant's motion for summary judgment. The Clerk of the court is directed to dismiss the complaint. Costs to defendant.

IT IS SO ORDERED.